UNITED STATES SECURITIES AND EXCHANGE COMMISSION, Plaintiff–Appellee,

v.

H. Thomas FEHN, Defendant–Appellant.

No. 94–16136.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 17, 1995.

Decided Oct. 9, 1996.

---

Gregory J. Sherwin, Fields, Fehn & Sherwin, Los Angeles, CA, for defendant-appellant.

Simon M. Lorne, Lucinda O. McConathy, Jacob H. Stillman and Catherine A. Broderick, Securities and Exchange Commission, Washington, D.C., for plaintiff-appellee.

Before: GOODWIN and HAWKINS, Circuit Judges, and FITZGERALD,** District Judge.

MICHAEL DALY HAWKINS, Circuit Judge:

This appeal requires us to apply Section 104 of the recently enacted Private Securities

** Honorable James M. Fitzgerald, Senior United States District Judge for the District of Alaska, sitting by designation.

Litigation Reform Act of 1995, which expressly authorizes the Securities and Exchange Commission ("SEC") to bring injunctive actions against those who aid and abet violations of certain securities laws.

California attorney H. Thomas Fehn appeals the district court's final judgment and permanent injunction order of April 1, 1994, which ordered Fehn to refrain from aiding and abetting violations of Section 10(b) and Section 15(d) of the Securities Exchange Act of 1934 and related regulations. Fehn advances three distinct challenges to the district court's injunction. He first contends that the Supreme Court's decision in *Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), which held that a private plaintiff may not maintain an action for aiding and abetting violations of Section 10(b) of the Securities Exchange Act, should extend to SEC injunctive actions like the one that precipitated this case. Fehn argues, in the alternative, that even if *Central Bank* does not preclude the SEC's injunctive action against him, the district court erroneously concluded that he aided and abetted violations of Section 10(b) and Section 15(d) and related regulations. Finally, Fehn contends that the district court abused its discretion in entering a permanent injunction against him.

We have jurisdiction over this appeal from a final judgment pursuant to 28 U.S.C. § 1291. We hold that extension of *Central Bank* to SEC injunctive actions is barred by Section 104 of the recently enacted Private Securities Litigation Reform Act of 1995, Pub.L. 104–67, 109 Stat. 737 (1995). We affirm the district court's permanent injunction order because we conclude that the court correctly found that Fehn had aided and abetted violations of Section 10(b) and Section 15(d) of the Securities Exchange Act and related regulations, and did not abuse its discretion in permanently enjoining him from future aiding and abetting violations.

**1.** We note that CTI in fact filed two Form S–18 registration statements containing substantially the same information; this fact is not relevant to this appeal.

**2.** Regulation S–K, Item 401(f) & (g), 17 C.F.R. §§ 229.401(f) & (g).

## FACTUAL AND PROCEDURAL BACKGROUND

### I. The Initial Public Offering by CTI Technical, Inc.

CTI Technical, Inc. was incorporated in Nevada in January 1987 by its promoter, Las Vegas resident Edwin "Bud" Wheeler. Although Wheeler directed CTI's operations from the date of its incorporation, his status as company president and chief executive officer was not disclosed publicly until August 1988. In June 1987, seeking to raise capital to acquire other businesses, CTI conducted a $200,000 "blind pool" initial public offering of securities ("IPO").

The CTI offering was tainted by violations of state and federal securities laws. First, CTI violated state blue sky laws by failing to register its securities with the states in which those securities were sold. Second, although CTI filed a Form S–18 registration statement with the SEC,[1] it violated the Securities Act of 1933 and SEC regulations[2] by failing to disclose that Wheeler was the promoter of the company and controlled its nominal directors. Finally, Wheeler and Stoneridge Securities, Inc., underwriter for the IPO, attempted to defraud investors by manipulating the price of the securities in aftermarket trading.

### II. The SEC Investigation of CTI's Initial Public Offering

In early 1988, the SEC launched a formal investigation of CTI's IPO. That investigation was to culminate in the SEC's September 1989 complaint against CTI and Wheeler. As a result of the SEC's action, the defendants consented to a permanent injunction against future securities laws violations, and Wheeler was convicted of securities fraud for misstatements and omissions in CTI's registration statement.[3]

**3.** Wheeler's conviction was affirmed in *United States v. Wheeler*, No. 93–10522, 1994 WL 384183 (9th Cir. July 22, 1994) (unpublished disposition).

In connection with the SEC investigation, defendant-appellant Fehn was retained to represent CTI and Wheeler, as well as CTI's underwriter and various CTI officers and directors. Fehn is a California attorney who has specialized in securities law during nearly three decades of practice. He has represented clients in connection with the registration and offering of securities under the Securities Act of 1933, compliance with reporting and disclosure requirements under the Securities Exchange Act of 1934, and litigation of various securities matters. Prior to Fehn's retention in connection with the SEC investigation, Fehn's law firm had represented underwriter Stoneridge Securities during CTI's IPO.

During the SEC investigation of CTI and Wheeler, Fehn became aware that CTI was not in compliance with certain reporting requirements of the Securities Exchange Act of 1934. First, Fehn learned that after the IPO, CTI had failed to file Form 10–Q quarterly reports as required by Section 15(d) of the Securities Exchange Act and related regulations. Second, Wheeler's investigative testimony before the SEC revealed that the Food and Drug Administration had banned sales of a diet product known as "Accupatch," CTI's main product and the source of gross sales of $1 million a month, and had impounded CTI's existing inventory of the product. CTI's registration documents, however, failed to disclose these FDA actions.

Fehn advised Wheeler that CTI was required to file the quarterly Form 10–Q's, and that it must disclose, in particular, the FDA's restriction of its Accupatch product. He also discussed with Wheeler whether the Securities Exchange Act required disclosure, in the Form 10–Q's, of Wheeler's and CTI's apparent violations of the Securities Act of 1933 in connection with the IPO. Wheeler flatly refused to make such disclosures. Fehn later testified that he told Wheeler it was his professional opinion that such disclosures were unnecessary under the regulations, and furthermore could impair Wheeler's ability to assert his Fifth Amendment privilege against self-incrimination with respect to those earlier violations.

Because Wheeler wished to limit CTI's expenses, he had a non-lawyer employee of CTI—rather than Fehn—draft the Form 10–Q's. Fehn gave Wheeler a copy of Regulation S–K, which outlines disclosure requirements for Form 10–Q, an instruction booklet describing how to fill out a Form 10–Q, and a sample Form 10–Q. The employee prepared a draft of the Form 10–Q for the quarter ending March 31, 1988, which disclosed the FDA's ban on CTI's Accupatch product. However, the Form 10–Q mischaracterized Wheeler's true role in CTI, describing him as CTI's recently appointed CEO and president rather than the individual who in fact had promoted, incorporated, and controlled the company since its inception. The form also failed to disclose the potential civil liability stemming from Wheeler's and CTI's earlier violations of state and federal securities laws. Fehn reviewed and edited the draft of the Form 10–Q, incorporating financial statements he had obtained from CTI's accountant. Fehn maintains that he made no substantive changes to the document, and, in particular, did not delete from the report any information the SEC later contended was improperly omitted. Fehn's secretary mailed the final Form 10–Q to the SEC, where it was filed in August 1988.

Based on CTI's Form 10–Q for the quarter ending March 31, 1988, Fehn's law firm prepared and mailed two other Form 10–Q's, for the quarters ending December 31, 1987, and June 30, 1988, respectively. These forms, too, mischaracterized Wheeler's relationship to CTI, and failed to mention contingent liabilities stemming from CTI's and Wheeler's earlier securities law violations. Fehn insists that his involvement in the preparation of these later Form 10–Q's was minimal, but the SEC points out that editing notations in Fehn's handwriting appeared on drafts of these Form 10–Q's. These Form 10–Q's were filed in November 1988.

## III. The SEC Injunctive Action Against Fehn

In November 1992, the SEC filed a complaint against Fehn, alleging that in preparing and filing the three Form 10–Q's, Fehn had aided and abetted violations of Sections

10(b) and 15(d) of the Securities Exchange Act, 15 U.S.C. §§ 78j(b) and 78o(d), and violations of Rules 10b–5, 12b–20, and 15d–13, 17 C.F.R. §§ 240.10b–5, 240.12b–20, and 240.15d–13. Pursuant to Section 20(b) of the Securities Act of 1933, 15 U.S.C. § 77t(b), and Sections 21(d) and 21(e) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78u(d) and 78u(e), the SEC brought an action to permanently enjoin Fehn from future securities laws violations. The SEC alleged that CTI and Wheeler had violated Section 10(b) and Section 15(d) by preparing and filing Form 10–Q's that contained false accounts of Wheeler's role in the promotion, formation and management of CTI and his control over CTI stock and directors, and failed to disclose "material contingent liabilities" stemming from CTI's violations of state and federal securities laws in connection with its 1987 IPO. Additionally, the SEC alleged that Fehn had knowingly lent "substantial assist[ance]" to Wheeler and CTI in the preparation and filing of the faulty Form 10–Q's.

On April 1, 1994, following a bench trial, the district court entered final judgment against Fehn, based on its findings that Fehn had aided and abetted violations of Sections 10(b) and 15(d) of the Securities Exchange Act, the Act's antifraud and reporting provisions, respectively, along with Rules 10b–5, 12b–20, and 15d–13. Because it concluded that there was a reasonable likelihood of future violations on Fehn's part, the district court entered an order permanently enjoining Fehn from future aiding and abetting violations of the securities laws. Fehn timely appealed.

**ANALYSIS**

Fehn raises three challenges to the district court's permanent injunction order. First, he argues that the Supreme Court's decision in *Central Bank of Denver v. First Interstate Bank of Denver,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), issued just two weeks after the permanent injunction order in this case, precludes SEC injunctive actions such as the one brought against him. Fail-

ing that challenge, he argues that the district court erred in finding that he aided and abetted violations of Sections 10(b) and 15(d) of the Securities Exchange Act and related regulations. Finally, he insists that the district court abused its discretion in entering a permanent injunction against him.

**I. The SEC's Authority to Enjoin Aiding and Abetting Violations of the Securities Laws after *Central Bank***

■ Because Fehn's challenge to the SEC's injunctive authority presents a question of law, we review this issue de novo. *Campbell v. Wood,* 18 F.3d 662, 681 (9th Cir.) (en banc), *cert. denied,* — U.S. ——, 114 S.Ct. 2125, 128 L.Ed.2d 682 (1994).

We note that Fehn's argument may well be precluded by recent congressional action. Concerned that *Central Bank* might be extended to eliminate the SEC's power to enjoin aiding and abetting violations, Congress recently enacted legislation reinforcing the SEC's authority to enjoin the aiding and abetting of primary violations of several securities laws.[4] That legislation, Section 104 of the Private Securities Litigation Reform Act of 1995, Pub.L. 104–67, 109 Stat. 737 (1995), appears to prevent lower federal courts from extending the logic of *Central Bank* to SEC injunctive actions.

**A. Section 104 of the Private Securities Litigation Reform Act of 1995**

■ Section 104 of the Private Securities Litigation Reform Act amended the heading to 15 U.S.C. § 78t by inserting the underlined portion: "Liability of controlling persons *and persons who aid and abet violations.*" Section 104 also added an entire new subsection to 15 U.S.C. § 78t. New subsection 78t(f) reads:

**(f) Prosecution of persons who aid and abet violations**

For purposes of any action brought by the Commission under paragraph (1) or (3) of

---

**4.** This legislation also allows the SEC to seek money penalties in civil actions for aiding and abetting, but that aspect of the legislation is not at issue here.

Section 78u(d) of this title,[5] any person that knowingly provides substantial assistance to another person in violation of a provision of this chapter, or of any rule or regulation issued under this chapter, shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided.

By its clear terms, Section 104 provides that aiding and abetting a violation of Chapter 2B, which encompasses 15 U.S.C. § 78a through § 78kk, is itself a violation, and as such is subject to injunctive actions and civil actions for money penalties by the SEC under 15 U.S.C. §§ 78u(d)(1) and 78u(d)(3). Both Section 10(b), 15 U.S.C. § 78j(b), and Section 15(d), 15 U.S.C. § 78o(d), fall within Chapter 2B. Section 104 of the Private Securities Litigation Reform Act thus authorizes SEC injunctive actions for the aiding and abetting of violations of Sections 10(b) and 15(d) and related regulations, and thereby reverses any impact *Central Bank* might have had on the SEC's power to enjoin aiding and abetting of these securities provisions.

Legislative history confirms that Section 104 was intended to override *Central Bank*'s apparent elimination of the SEC's power to enjoin the aiding and abetting of securities law violations. Discussion of the proposed legislation is contained in Senate Banking Committee Report No. 104–98 on the Senate version of the bill, S. 240. That report makes clear the drafters' intent to authorize the SEC to enjoin those who aid and abet such violations:

Prior to the Supreme Court's decision in *Central Bank of Denver v. First Interstate Bank of Denver*, courts of appeals had recognized that private parties could bring actions against persons who "aided and abetted" primary violators of the securities laws. In *Central Bank*, the Court held that there was no aiding and abetting liability for private lawsuits involving violations of the securities antifraud provisions. The Committee considered testimony endorsing the result in *Central Bank* and

testimony seeking to overturn this decision. The Committee believes that amending the 1934 Act to provide explicitly for private aiding and abetting liability actions under Section 10(b) would be contrary to S. 240's goal of reducing meritless securities litigation. *The Committee does, however, grant the SEC express authority to bring actions seeking injunctive relief or money damages against persons who knowingly aid and abet primary violators of the securities laws.*

S.Rep. No. 98, 104th Cong., (1995) (emphasis added).

The Conference Report adopted S. 240's Section 104 as part of the combined bill, H.R. 1038. *See* 141 Cong. Rec. S17,965–03, *S17,984 (daily ed. Dec. 5, 1995) (statement of Sen. Moseley–Braun). Although the Conference Report does not discuss the purpose of Section 104, floor statements by several senators consistently describe Section 104 as a provision to reinstate the SEC's power to enjoin the aiding and abetting of the securities laws. Introducing the conference bill, Senator D'Amato remarked:

The conference report also reinstates the SEC's authority—which the Supreme Court put into question in the *Central Bank of Denver* case—to bring actions against defendants who knowingly aid and abet securities fraud.

141 Cong. Rec. S17,933–04, *S17,934 (daily ed. Dec. 5, 1995) (statement of Sen. D'Amato).

Sen. Dodd stated that the legislation:

restores enforcement authority to the Securities and Exchange Commission. That was lost ... in the 1994 Supreme Court case, the *Central Bank* case. We, in this bill, restore what the *Central Bank* took away from the SEC here.

. . .

[T]he bill restores the ability of the Securities and Exchange Commission to pursue those who knowingly aid and abet securities fraud.

---

**5.** The paragraphs in Section 78u(d) to which Section 104 refers empower the SEC to enjoin securities violations and to seek money penalties in civil actions, respectively. 15 U.S.C. § 78u(d)(1) & 78u(d)(3).

141 Cong. Rec. S17,933–04, *S17,957 (daily ed. Dec. 5, 1995) (statement of Sen. Dodd).

Sen. Reid noted that "[t]he compromise agreement authorizes the SEC to bring enforcement actions against those who aid and abet a securities fraud, thus reversing the Supreme Court's *Central Bank* decision as it applies to the SEC." 141 Cong. Rec. S17,965–03, *S17,977 (daily ed. Dec. 5, 1995) (statement of Sen. Reid).

Finally, in complaining about the bill's failure to create an express private cause of action against aiders and abettors, Sen. Sarbanes stated:

> This bill, unfortunately, restores only the SEC's ability to go after aiders and abettors of violations of the securities laws and then only in part—only in part. The provision in the bill is limited to violations of section 10(b) of the Securities Exchange Act and to defendants who act knowingly.

141 Cong. Rec. S17,933–04, *S17,937 (daily ed. Dec. 5, 1995) (statement of Sen. Sarbanes).

These statements by legislators reinforce our conclusion·that Section 104, by its terms, empowers the SEC to enjoin the aiding and abetting of "violation[s] of .. provision[s] of [[C]hapter 2B], or of any rule or regulation issued under [[C]hapter 2B]," which includes 15 U.S.C. § 78a through § 78kk. Section 104 thus covers the type of injunctive action in this case, which sought to enjoin Fehn's alleged aiding and abetting of violations of Section 10(b) and Section 15(d) of the Securities Exchange Act, 15 U.S.C. §§ 78j(b) & 78o(d). Given the unique timing of events in this case, however, we must determine if Section 104 applies to the events underlying this particular injunctive action.

## B. Whether Section 104 of the Private Securities Litigation Reform Act of 1995 Applies to this Case

■ A threshold consideration is whether Section 104 applies to this appeal, which was argued before Section 104 was enacted. The district court's final judgment against Fehn and permanent injunction order were entered April 1, 1994. At that moment, it was the well-settled law of this Circuit that there existed a private right of action for aiding and abetting violations of Section 10(b). *See Hauser v. Farrell*, 14 F.3d 1338, 1343 (9th Cir.1994).[6] Just eighteen days later, on April 19, 1994, the Supreme Court issued its decision in *Central Bank*, eliminating the implied private cause of action for aiding and abetting violations of Section 10(b) of the Securities Exchange Act. This decision, which was premised on the Court's conclusion that the statute did not prohibit aiding and abetting, threw into doubt the viability of SEC injunctive actions like the one brought against Fehn. *Central Bank*, 511 U.S. at ——, 114 S.Ct. at 1455.[7] Fehn thereafter appealed to this Court, arguing that *Central Bank* should extend to SEC injunctive actions. On December 22, 1995, two months after oral argument in this appeal, Congress overrode a presidential veto to enact the Private Securities Litigation Reform Act of 1995. Section 104 of the Act prohibits precisely what Fehn seeks in this appeal: the extension of *Central Bank* to SEC injunctive actions.

This sequence of events is unusual in that the SEC's authority to enjoin aiding and abetting existed at the time of the final judgment against Fehn, was arguably precluded two weeks later by *Central Bank*, and was reinstated several weeks after the appeal was argued. Although the Private Securities Lit-

---

6. Also at issue in this appeal is Fehn's potential liability for aiding and abetting violations of Section 15(d) of the Securities Exchange Act, 15 U.S.C. § 78o(d). Although aiding and abetting liability under Section 15(d) is not nearly as well-established as that under Section 10(b), it does pre-date *Central Bank*. *See SEC v. Arthur Young & Co.*, 590 F.2d 785, 786 (9th Cir.1979).

7. Dissenting in *Central Bank*, Justice Stevens warned:

> [T]his case concerns only the existence and scope of aiding and abetting liability in suits brought by private parties under § 10(b) and Rule 10b–5. The majority's rationale, however, sweeps far beyond even those important issues. The majority leaves little doubt that the Exchange Act does not even permit the *Commission* to pursue aiders and abettors in civil enforcement actions under § 10(b) and Rule 10b–5.
>
> *Central Bank*, 511 U.S. at ——, 114 S.Ct. at 1459–60 (Stevens, J., dissenting).

igation Reform Act does not expressly make Section 104 applicable to conduct and events that precede its enactment, principles governing the retrospective application of statutes indicate that Section 104 applies to Fehn's appeal.

In *Landgraf v. USI Film Products,* 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), the Supreme Court clarified the proper analysis for deciding whether a statute enacted while an appeal is pending should apply to events and conduct that occurred *before* that statute's enactment. The Court's treatment of this problem had long been fraught with confusion stemming from the clash of two "seemingly contradictory" default rules that come into play where statutes "do not specify their temporal reach." *Landgraf,* 511 U.S. at ——, 114 S.Ct. at 1496. The first default rule is that "a court is to apply the law in effect at the time it renders its decision." *Id.* (quoting *Bradley v. School Bd. of Richmond,* 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974)). The second, conflicting, default rule is that " '[r]etroactivity is not favored in the law,' " and this principle carries the "interpretive corollary that 'congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result.' " *Id.* (quoting *Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 208, 109 S.Ct. 468, 471, 102 L.Ed.2d 493 (1988)).

In *Landgraf,* the Court set forth an analysis intended to resolve this conflict. *Landgraf* described a two-step analysis for determining whether to apply an intervening civil statute to events that precede its enactment. When a case implicates a federal civil statute enacted after the events in suit, a court's first task is to determine "whether Congress has expressly prescribed the statute's proper reach." *Id.,* at ——, 114 S.Ct. at 1505. If Congress has done so, "there is no need to resort to judicial default rules," since the statute guides its application. *Id.* If, however, "the statute contains no such express command, the court must determine whether the new statute would have retroactive effect, i.e., whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new

duties with respect to transactions already completed." *Id.* If the statute has "retroactive effect," explained the Court, "our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result." *Id.*

In this case, the Private Securities Litigation Reform Act, enacted December 22, 1995, does not "expressly prescribe[ ] [Section 104's] proper reach." *Id.* Within Title I of the Act, which contains Section 104, Section 108, a note entitled "Applicability," provides:

> The amendments made by this title shall not affect or apply to any *private* action arising under title I of the Securities Exchange Act of 1934 or title I of the Securities Act of 1933, commenced before and pending on the date of enactment of this Act.

Section 108, Pub.L. 104-67, 109 Stat. 737 (1995) (emphasis added).

Although Section 108 provides that the Act is to apply to "private" actions only from the date of enactment, the provision is silent with respect to actions by the SEC. Because the Act contains no "express[ ] prescri[ption]" as to Section 104's temporal scope, we therefore "must determine whether [Section 104] [has] retroactive effect." *Landgraf,* 511 U.S. at ——, 114 S.Ct. at 1505.

To ease the tension between the *Bradley* default rule ("a court is to apply the law in effect at the time it renders its decision," *Bradley,* 416 U.S. at 711, 94 S.Ct. at 2016), and the presumption against retroactivity ("congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result," *Bowen,* 488 U.S. at 208, 109 S.Ct. at 471), *Landgraf* clarified the definition of "retroactive" or "retrospective," terms the Court used interchangeably. It explained that "[a] statute does not operate 'retrospectively' merely because it is applied in a case arising from conduct antedating the statute's enactment," or "upsets expectations based in prior law." *Landgraf,* 511 U.S. at ——, 114 S.Ct. at 1499 (citation omitted). Instead, the test of retroactivity is *"whether the new provision attaches new legal consequences to events completed before its enactment." Id.* (emphasis added).

Deciding whether retroactivity exists, explained the Court, is a fact-intensive inquiry:

> The conclusion that a particular rule operates 'retroactively' comes at the end of a process of judgment concerning *the nature and extent of the change in the law* and *the degree of connection between the operation of the new rule and a relevant past event.* Any test of retroactivity will leave room for disagreement in hard cases, and is unlikely to classify the enormous variety of legal changes with perfect philosophical clarity.

*Id.* (emphasis added). Factors that should guide courts include "familiar considerations of fair notice, reasonable reliance, and settled expectations." *Id.*[8]

Applying the *Landgraf* analysis here, it appears Section 104 does not "attach new legal consequences" to the events underlying the SEC's injunction of Fehn. Indeed, Section 104 may be said to restore the legal consequences that obtained at the time of the district court's judgment against Fehn, but that may have been temporarily eliminated by the *Central Bank* decision. It therefore does not "impair rights [Fehn] possessed when he acted, increase [Fehn's] liability for past conduct, or impose new duties [on Fehn] with respect to transactions already completed." *Id.*, at ——, 114 S.Ct. at 1505. We need not address whether Section 104, in expressly authorizing SEC injunctive actions for aiding and abetting *other* violations of Chapter 2B, creates wholly new legal consequences, since the SEC's power to enjoin aiding and abetting violations of Sections 10(b) and 15(d) antedated Section 104. *See Hauser*, 14 F.3d at 1343 (aiding and abetting liability under Section 10(b)); *SEC v. Arthur Young & Co.*, 590 F.2d 785, 786 (9th Cir.

1979) (aiding and abetting liability under Section 15(d)).

Moreover, in the context of Fehn's appeal, Section 104 lacks the features that make application of a civil statute to antecedent events objectionable. The rationale undergirding the "presumption against retroactive legislation" has little relevance to the unusual sequence of events in this case. *Id.*, at ——, 114 S.Ct. at 1497. The presumption against retroactive legislation is grounded in "[e]lementary considerations of fairness," which "dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly," and which require that "settled expectations [ ] not be lightly disrupted." *Id.* In this case, Fehn's expectations have not been defeated: at the time the SEC launched its investigation of his activities, *Central Bank* had not yet been decided and Fehn therefore had every reason to expect that the SEC had the authority to enjoin the aiding and abetting of violations of Sections 10(b) and 15(d) of the Securities Exchange Act. Although *Central Bank* ignited a temporary hope that Fehn might be able to avoid the injunction, Congress rather swiftly undid any effect *Central Bank* had on the SEC's injunctive authority.

■ Finally, *Landgraf* articulated another principle that makes the application of Section 104 to this case appropriate. In refining the definition of "retroactivity," the *Landgraf* court enumerated several exceptions to the general presumption against retroactivity, explaining that "[e]ven absent specific legislative authorization, application of new statutes passed after the events in suit is unquestionably proper in many situations." *Id.*, at ——, 114 S.Ct. at 1501. One such

---

**8.** We have applied the *Landgraf* retroactivity analysis in a variety of contexts. *Compare Samaniego–Meraz v. INS*, 53 F.3d 254, 256 (9th Cir.1995) (finding application of statutory amendment to pre-amendment events not retroactive because amendment repealed Attorney General's discretionary power to grant relief, and repeal of merely discretionary power did not "attach new legal consequences" to pre-enactment events), *with Chenault v. United States Postal Serv.*, 37 F.3d 535, 539 (9th Cir.1994) (holding that newly enacted statute shortening statute of limitations may not be applied to plaintiff's pre-enactment failure to timely file suit, since that

application would "prejudice the rights" of the claimant), *and Hyatt v. Northrop Corp.*, 80 F.3d 1425, 1429 (9th Cir.1996), *petition for cert. filed*, 65 USLW 3033 (July 2, 1996) (holding that statutory amendment imposing new obligations in connection with filing of suit may not be applied to bar complaint filed prior to statutory amendment, since to do so "would impose new duties" on claimant), *and United States v. $814,254.76*, 51 F.3d 207, 210 (9th Cir.1995) (declining to apply amended civil forfeiture statute to pre-enactment events because statute, in subjecting a broader range of funds to forfeiture, "attache[d] new legal consequences" to money laundering).

exception has particular relevance here. This exception provides that where the new statute "authorizes or affects the propriety of *prospective relief*," the "application of the new provision is not retroactive." *Id.* (emphasis added). Intervening statutes that grant injunctive power fall under this category because " 'relief by injunction operates *in futuro.*' " *Id.* (citing *American Steel Foundries v. Tri–City Central Trades Council,* 257 U.S. 184, 201, 42 S.Ct. 72, 75, 66 L.Ed. 189 (1921)). In *American Steel Foundries,* the Court held that Section 20 of the Clayton Act, enacted while the case was pending on appeal, governed the propriety of injunctive relief against labor picketing. It remanded the case for application of the intervening statutory provision, which limited district courts' powers to enjoin labor picketing.[9]

Section 104, as applied to this case, falls within that exception to the definition of retroactivity recognized by the *Landgraf* court: In authorizing the SEC to enjoin aiding and abetting, Section 104 "authorizes or affects the propriety of prospective relief." *Landgraf,* 511 U.S. at ——, 114 S.Ct. at 1501. Because Fehn's appeal implicates only the SEC's injunctive authority under the new statute, we need not address that portion of Section 104 authorizing the SEC to seek money penalties in civil actions for aiding and abetting violations of the securities laws. Based on the principles set forth in *Landgraf,* we conclude that we must apply Section 104 of the Private Securities Litigation Reform Act to Fehn's appeal. We turn next to that task.

### C. The Impact of Section 104 on Fehn's *Central Bank* Argument

Having concluded that we must apply Section 104 of the Private Securities Litigation Reform Act to this appeal, we first examine its impact on Fehn's assertion that *Central Bank* implicitly precludes the SEC's injunctive action in this case. As we explained above, Section 104 expressly authorizes the SEC to bring injunctive actions against aiders and abettors of securities law violations. Congress responded rapidly and resoundingly to the Supreme Court's elimination of private actions against aiders and abettors of securities law violations. In enacting Section 104, Congress flatly barred the judicial extension of *Central Bank* to impede SEC enforcement actions against aiders and abettors. In light of Congress' emphatic repudiation of *Central Bank* in the context of SEC injunctive actions, we reject Fehn's first challenge to the permanent injunction.

Fehn also argues that his actions did not constitute aiding and abetting under Section 10(b) and Section 15(d) of the Securities Exchange Act, and that the district court abused its discretion in permanently enjoining him from future violations. We turn next to consider the merits of these arguments.

### II. Whether the District Court Erred in Finding Fehn Liable for Aiding and Abetting Violations of Section 10(b) and Section 15(d) of the Securities Exchange Act and Related Regulations

Before addressing Fehn's contention that the district court erred in permanently enjoining him from future aiding and abetting violations of Sections 10(b) and 15(d) of the Securities Exchange Act, we must first ascertain the elements of aiding and abetting liability under Section 104 of the Private Securities Litigation Reform Act.

### A. The Elements of Aiding and Abetting Liability under Section 104 of the Private Securities Litigation Act of 1995

In authorizing the SEC to pursue injunctive actions for aiding and abetting violations of certain securities laws, Congress provided that Section 104 governs the "[l]iability of controlling persons *and persons who aid and abet violations.*" Section 104 provides:

**(f) Prosecution of persons who aid and abet violations** For purposes of any action

---

9. Following *Landgraf,* at least one lower federal court has held that an intervening statute that authorizes or affects prospective relief is not invalidly retroactive, and may be applied to pre-enactment events. *See Scheidemann v. INS,* 83 F.3d 1517, 1523 (3rd Cir.1996) (applying amended statute limiting scope of Attorney General's discretion to grant relief from deportation because such amendment had "only a prospective impact.").

brought by the Commission under paragraph (1) or (3) of Section 78u(d) of this title,[10] *any person that knowingly provides substantial assistance to another person in violation of a provision of this chapter, or of any rule or regulation issued under this chapter,* shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided. (emphasis added)

■ We note that Congress employed language identical to that used by lower federal courts in articulating the elements of aiding and abetting under Section 10(b) *before Central Bank* eliminated private causes of action for aiding and abetting. Before *Central Bank,* the elements of aiding and abetting under Section 10(b) were: (1) the existence of an independent primary violation; (2) actual knowledge by the alleged aider and abettor of the primary violation and of his or her own role in furthering it;[11] and (3) "substantial assistance" by the defendant in the commission of the primary violation. *Hauser,* 14 F.3d at 1343. The new Section 104 defines aiding and abetting as follows: (1) the defendant acted "knowingly," (2) the defendant "provide[d] substantial assistance," and (3) that assistance was given "to another person in violation of a provision of this chapter, or of any rule or regulation issued under this chapter." The elements of the new Section 104 clearly mirror the elements this Court and others traditionally used to define aiding and abetting under Section 10(b). In our view, the symmetry between the elements of aiding and abetting *before Central Bank* and *after* Section 104 is a strong indication that Congress intended Section 104 to preserve the definition of aiding and abetting as it existed pre-*Central Bank.*

The legislative history surrounding Section 104 bolsters our conclusion. The statements contained in that history consistently make clear that the amendment's purpose is to negate any effect *Central Bank* might have had on the SEC's authority to bring injunctive actions against aiders and abettors of certain securities law violations. Based on the language of the new Section 104 and its legislative history, we conclude that Section 104 simply restores the pre-*Central Bank* status quo with respect to SEC injunctive actions.

The elements of aiding and abetting under Section 15(d) are more difficult to discern, simply because there are virtually no pre-*Central Bank* decisions among the lower federal courts defining aiding and abetting liability for violations of Section 15(d). In this Circuit, *Arthur Young* recognized aiding and abetting liability under Section 15(d), but did not enumerate what the SEC must prove to establish it. *Arthur Young,* 590 F.2d at 786. As noted above, however, Section 104 employs the distinctive language defining the elements of aiding and abetting under Section 10(b). Based on the language of the new Section 104, we conclude that application of a similar test is appropriate in the context of Section 15(d), namely: (1) the existence of an independent primary violation; (2) actual knowledge by the alleged aider and abettor of the primary violation and of his or her own role in furthering it; and (3) "substantial assistance" in the commission of the primary violation. *Hauser,* 14 F.3d at 1343 (setting forth elements of aiding and abetting liability under Section 10(b)).

## B. Whether Fehn Aided and Abetted Violations of Sections 10(b) and 15(d) of the Securities Exchange Act and Related Regulations

Fehn's challenge to the district court's final judgment is multi-faceted. First, he contends that *the district court erred in finding primary violations of Sections 10(b) and 15(d)* of the Securities Exchange Act, insisting that

---

10. The paragraphs in Section 78u(d) to which Section 104 refers empower the SEC to enjoin securities violations and to seek money penalties in civil actions, respectively. 15 U.S.C. § 78u(d)(1) & 78u(d)(3).

11. We acknowledge that other decisions by this Court have defined this element as "actual

knowledge *or* reckless disregard." *Levine v. Diamanthuset, Inc.,* 950 F.2d 1478, 1483 (9th Cir.1991) (emphasis added). We do not address this discrepancy because Section 104, by its plain terms, requires "know[ledge]" as an element of aiding and abetting.

these provisions and their implementing regulations did not require disclosure of Wheeler's role as promoter, or of the contingent liabilities stemming from CTI's and Wheeler's earlier securities law violations. In the alternative, he contends that such a disclosure requirement was trumped by Wheeler's Fifth Amendment privilege against self-incrimination. He also argues that Wheeler lacked the requisite scienter for commission of the primary violation. Second, Fehn argues that, even if there were primary violations of Sections 10(b) and 15(d) and related regulations by CTI and Wheeler, Fehn did not "substantial[ly] assist" those violations. Finally, he insists that he did not possess the requisite scienter for aiding and abetting liability because his professional advice to CTI and Wheeler was offered in good faith. We review de novo the district court's conclusions of law, and we review for clear error its findings of fact. *Campbell,* 18 F.3d at 681.

## 1. The Existence of a Primary Violation

### a. Disclosure Requirements under Section 10(b) and Section 15(d)

Section 10(b), the central antifraud provision of the Securities Exchange Act, 15 U.S.C. § 78j(b), makes it unlawful "for any person, directly or indirectly":

> To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).

Rule 10b–5 further defines the conduct prohibited under Section 10(b), making it unlawful:

> (a) [t]o employ any device, scheme, or artifice to defraud,
>
> (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

■ To prove a primary violation of Section 10(b) of the Securities Exchange Act, the SEC was required to "show that there has been a misstatement or omission of material fact, made with scienter." *McCormick v. Fund American Cos.,* 26 F.3d 869, 875 (9th Cir.1994) (citations omitted). That misstatement or omission "must be misleading," *id.,* and "in the case of an omission [of material fact], 'silence, absent a duty to disclose, is not misleading under Rule 10b–5.' " *Id.* (quoting *Basic Inc. v. Levinson,* 485 U.S. 224, 239 n. 17, 108 S.Ct. 978, 987, fn. 17, 99 L.Ed.2d 194 (1988)). Materiality "depends on the significance the reasonable investor would place on the withheld or misrepresented information." *Basic,* 485 U.S. at 240, 108 S.Ct. at 988.

Section 15(d) is a key reporting and disclosure provision of the Securities Exchange Act, 15 U.S.C. § 78o(d). It provides that issuers that have filed registration statements with the SEC

> shall file with the Commission, in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, such *supplementary and periodic information,* documents, and reports as may be required

by other provisions of the securities laws and SEC regulations. 15 U.S.C. § 78o(d) (emphasis added).

Rule 15d–13 implements Section 15(d)'s disclosure provision by requiring issuers to file quarterly 10–Q reports. Rule 12b–20 requires that, in addition to information explicitly required by other securities regulations,

> there shall be added such further material information, if any, as may be necessary to make the required statements, in the light

of the circumstances under which they are made not misleading.

Rule 12b–20, 17 C.F.R. § 240.12b–20.

Fehn insists that the securities laws impose no duty to disclose, in a quarterly Form 10–Q, a failure to identify a company's promoter at the time of an initial public offering or the existence of prior securities law violations.

We disagree. Read against the backdrop of events in this case, these provisions required CTI and Wheeler to describe correctly Wheeler's role at CTI and to disclose the contingent liabilities stemming from earlier securities law violations.

■ In considering whether disclosure of Wheeler's role as promoter was necessary, we first note that Item 15(d) of Form S–18, the form for submitting registration statements to the SEC, requires companies registering securities to identify their promoter in the registration statement. When CTI submitted its Form S–18 to the SEC, however, it plainly failed to disclose that Wheeler was promoter of the company. That deficient registration statement was subsequently disseminated to investors, prospective investors, and the general public. We next note that the Form 10–Q's CTI submitted to the SEC in late 1988, at Fehn's direction and pursuant to Rule 15d–3, represented that Wheeler had only *recently* become president and CEO of CTI, when, in fact, he had been its promoter and had directed its activities since its incorporation in January 1987.

These statements in the Form 10–Q's were not only misleading in their own right, but, read in conjunction with CTI's deficient Form S–18, compounded the misinformation about Wheeler's role at CTI. First, because these statements about Wheeler's role were objectively untrue and, in our view, material,

the Form 10–Q's contained an "untrue statement of a material fact" in violation of Rule 10b–5. Second, the statements characterizing Wheeler's role were further misleading when read in conjunction with CTI's earlier Form S–18. Because the Form S–18 had previously failed to identify Wheeler as CTI's promoter, the Form 10–Q's representation that Wheeler had only recently joined the company further clouded the identity of the promoter because it suggested Wheeler was *not* CTI's promoter. Rule 12b–20 requires the disclosure of "further material information, if any, as may be necessary to make the *required statements,* in the light of the circumstances under which they are made not misleading." (emphasis added). Rule 12b–20's reference to "required statements" encompasses Form S–18, since item 15(d) of Form S–18 mandates disclosure of the issuer's promoter. In this case, · Rule 12b–20 required disclosure of Wheeler's true relationship with CTI, because that disclosure was "further material information ... necessary" to make Form S–18 "not misleading."

■ We next consider whether it was necessary to disclose the contingent liabilities stemming from CTI's and Wheeler's earlier securities law violations. We first note that the Form 10–Q's contained required financial information supplied by CTI's accountants and reviewed by Fehn. That information did not reflect, however, the considerable exposure CTI faced in light of potential private lawsuits arising out of the same set of facts that had led to the 1988 SEC investigation against CTI and Wheeler, the 1989 complaint and injunction against CTI, and Wheeler's conviction. As such, the Form 10–Q's violated the provisions of Rules 10b–5 and 12b–20, which require the disclosure of information where it is "necessary" to make other statements "not misleading." [12]

12. Fehn invokes *United States v. Matthews,* 787 F.2d 38 (2nd Cir.1986) for the proposition that the absence of a specific regulation requiring disclosure of the two aforementioned items precludes such a disclosure. We disagree. *Matthews* involved the disclosure requirements for proxy statements under Rule 14a–9, 17 C.F.R. § 240.14a–9. In this case, the SEC charged a violation of Rule 10b–5 which we have said "imposes a duty to disclose material facts that are necessary to make disclosed statements, whether mandatory or volunteered, not misleading." *Hanon v. Dataproducts Corp.,* 976 F.2d 497, 504 (9th Cir.1992). That duty is a general one, and arises whenever a disclosed statement would be "misleading" in the absence of the "disclos[ure] of [additional] material facts" needed to make it *not* misleading. *Id.* As we explained above, the information contained in the Form 10–Q's—the mischaracterization of Wheeler's role and of CTI's financial condition—required further disclosures to render them "not misleading."

Fehn contends that the earlier securities law violations did not have to be disclosed because they "did not create any material, contingent financial liabilities." For this proposition, he relies on the Financial Accounting Standards Board's Financial Accounting Standard Number 5 ("FASB 5"), which covers "accounting for contingencies." We reject Fehn's argument for two reasons. First, we note that the standard set forth in FASB 5 requires that "disclosure of the contingency shall be made when there is at least a *reasonable possibility* that a loss ... may have been incurred." Indeed, FASB 5 specifically covers contingent liability stemming from private litigation, for it provides that:

> an investigation of an enterprise by a governmental agency, if enforcement proceedings have been or are likely to be instituted, is often followed by private claims for redress, and the probability of their assertion and the possibility of loss should be considered in each case.

Fehn mischaracterizes FASB 5 because he insists that FASB 5 requires a "probability" of a contingent event to trigger disclosure.

A more important flaw in Fehn's argument, however, is that it contravenes the securities-law standard for determining the materiality of a corporate event that has not yet occurred. In evaluating the materiality of an event that is "contingent or speculative in nature," *Basic* provides that "materiality 'will depend at any given time upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity.'" *Basic*, 485 U.S. at 238, 108 S.Ct. at 987 (quoting *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833 (2nd Cir.1968) (en banc)). This standard requires an issuer to weigh the likelihood of a potential event and the magnitude of that potential event in determining the materiality of an omission. *Basic*, 485 U.S. at 238–39, 108 S.Ct. at 986–87. Applying this standard here, we conclude that the omissions in this case were material. Although CTI's liabilities were not inevitable, but instead were contingent, they represented a potentially large financial loss for CTI.

**b. Whether the Disclosure Requirements under Section 10(b) and Section 15(d) Violate the Fifth Amendment Privilege against Self–Incrimination**

As an alternate defense to CTI's failure to disclose potential liabilities arising from earlier securities law violations, Fehn argues that such a disclosure, even if required under the securities laws, would have violated Wheeler's Fifth Amendment privilege against self-incrimination.

We disagree. As the Supreme Court long ago explained, "[w]henever [a court] is confronted with the question of a compelled disclosure that has an incriminating potential," the "[t]ension between the State's demand for disclosures and the protection of the right against self-incrimination" must be resolved by "balancing the public need on the one hand, and the individual claim to constitutional protections on the other." *California v. Byers*, 402 U.S. 424, 427, 91 S.Ct. 1535, 1537, 29 L.Ed.2d 9 (1971) (plurality).

A key principle guiding this balancing analysis is that "the *mere possibility* of incrimination is insufficient to defeat the strong policies in favor of [ ] disclosure." *Id.* (emphasis added). To invoke the privilege against self-incrimination, a claimant must show "that the compelled disclosures will themselves confront the claimant with 'substantial hazards of self-incrimination.'" *Id.* at 429, 91 S.Ct. at 1538 (quoting *United States v. Sullivan*, 274 U.S. 259, 47 S.Ct. 607, 71 L.Ed. 1037 (1927)). A corollary to this principle is that "the Fifth Amendment privilege may not be invoked to resist compliance with a regulatory regime constructed to effect the State's public purposes unrelated to the enforcement of its criminal laws." *Baltimore City Dept. of Social Services v. Bouknight*, 493 U.S. 549, 554, 110 S.Ct. 900, 905, 107 L.Ed.2d 992 (1990).

In determining whether a compelled disclosure threatens self-incrimination, several factors are to be considered: (1) whether the disclosure requirement targets a " 'highly selective group inherently suspect of criminal activities,' " rather than the public generally, *Byers*, 402 U.S. at 430, 91 S.Ct. at 1539

(citing *Albertson v. Subversive Activities Control Bd.*, 382 U.S. 70, 79, 86 S.Ct. 194, 199, 15 L.Ed.2d 165 (1965)); (2) whether the requirement involves "'an area permeated with criminal statutes,'" rather than "'an essentially noncriminal and regulatory area of inquiry,'" *Id.* (citing *Albertson*, 382 U.S. at 79, 86 S.Ct. at 199); and (3) whether compliance would compel disclosure of information that "would surely prove a significant 'link in a chain' of evidence tending to establish [ ] guilt," *Marchetti v. United States*, 390 U.S. 39, 48, 88 S.Ct. 697, 703, 19 L.Ed.2d 889 (1968) (citation omitted), rather than disclosing "no inherently illegal activity." *Bouknight*, 493 U.S. at 557, 110 S.Ct. at 906 (internal quotations and citations omitted).

We have applied these principles in a variety of contexts, and have accorded them varying emphasis. For example, in *United States v. Flores*, 753 F.2d 1499 (9th Cir.1985) (en banc), we held that a defendant's Fifth Amendment privilege against self-incrimination was not violated by the Federal Gun Control Act, 18 U.S.C. § 922(e), which required individuals to notify carriers in writing before shipping firearms in interstate or foreign commerce. The defendant, who was convicted under the statute for failure to disclose an international shipment of concealed firearms, argued that the notice requirement violated his Fifth Amendment right against self-incrimination because it would have compelled him to confess a number of criminal acts. Although we acknowledged that the transport of firearms was an activity "'permeated with criminal statutes,'" *Flores*, 753 F.2d at 1501, we nevertheless concluded that the notice requirement was permissible because it was "not directed at a group of persons 'inherently suspect of criminal activities,'" *id.* (citation omitted), and had a "general regulatory" purpose. *Id.* at 1502.

In deciding *Flores*, we distinguished a line of cases wherein the Supreme Court had struck down various reporting or registration requirements as inconsistent with the privilege against self-incrimination.[13] The common infirmities of those statutes, we explained, was that they imposed a disclosure requirement "in an area of activity 'permeated with criminal statutes,' or directed at a group of persons 'inherently suspect of criminal activities,'" and "compliance with [the disclosure] requirements ... produced an immediate or 'real and appreciable' hazard of self-incrimination due to the fact that the statutes were largely designed to discover ... involvement in the prohibited activity." *Id.* at 1501; *see also United States v. Des Jardins*, 747 F.2d 499, 508 (9th Cir.1984) (currency reporting requirement did not violate privilege against self-incrimination; though requirement was not exclusively regulatory in nature, it did not involve a field "'permeated with criminal statutes,'" was not aimed at a "'highly selective group inherently suspect of criminal activities,'" and did not require disclosure of inherently illegal activity), *rev'd, in part, on other grounds*, 772 F.2d 578 (9th Cir.1985).

Although we have not yet applied these principles in the securities regulation context, other lower federal courts have done so. *See Whiteside & Co. v. SEC*, 883 F.2d 7, 10 (5th Cir.1989) (net capital deficiency reporting requirement did not violate right against self-incrimination of broker-dealer firm or its president because requirement was "regulatory rather than penal."); *United States v. Stirling*, 571 F.2d 708, 728 (2nd Cir.) (defendants not precluded, on grounds of self-incrimination, from being charged with making false statements in registration statement, since registration statement was part of regulatory scheme), *cert. denied*, 439 U.S. 824, 99 S.Ct. 93, 58 L.Ed.2d 116 (1978); *Whiteside & Co. v. SEC*, 557 F.2d 1118, 1121 n. 3

---

**13.** These cases included *Marchetti v. United States*, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968) (striking down statute requiring gamblers to register with the Internal Revenue Service, in light of wide prohibition of gambling); *Grosso v. United States*, 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968) (overturning conviction for failure to pay excise tax on gambling); *Haynes v. United States*, 390 U.S. 85, 88 S.Ct. 722, 19

L.Ed.2d 923 (1968) (striking down statute that required registration of individuals transacting in firearms and that was applied only to weapons used principally by persons engaged in unlawful activities); and *Leary v. United States*, 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969) (invalidating statute requiring defendant to identify himself as transferee of marijuana who had failed to register and pay an occupational tax).

(5th Cir.1977) (SEC regulation requiring broker-dealers to notify the SEC of a failure to make a timely reserve deposit did not violate right against self-incrimination because requirement was regulatory), *cert. denied,* 435 U.S. 942, 98 S.Ct. 1521, 55 L.Ed.2d 538 (1978); *Sloan v. SEC,* 547 F.2d 152, 154 (2nd Cir.1976) (section of Securities Exchange Act of 1934 requiring brokers to disclose certain information in registration statements was "not criminal but clearly regulatory in nature" and therefore did not infringe on petitioner's privilege against self-incrimination), *cert. denied,* 434 U.S. 821, 98 S.Ct. 63, 54 L.Ed.2d 77 (1977); *SEC v. Radio Hill Mines Co.,* 479 F.2d 4, 7 (2nd Cir.1973) (defendant found to have violated antifraud provisions of Securities Act of 1933 and Securities Exchange Act of 1934 could not invoke Fifth Amendment privilege as defense to SEC-initiated injunction compelling him to disclose record of all past transactions).

In *Stirling,* the Second Circuit faced a challenge to a disclosure requirement similar to the one Fehn raises here: the defendant argued that, had he disclosed in the SEC registration statement the nature of various stock transactions with union officials, he might have been admitting facts sufficient to form the basis for criminal prosecution under the Taft–Hartley Act, 29 U.S.C. § 186. For three reasons, the Second Circuit held that the reporting requirements under the Securities Act of 1933 did not violate the defendant's privilege against self-incrimination. First, it declared that "the securities laws are 'essentially noncriminal and regulatory' and that [the disclosure requirement was] essential to the fulfillment of the central purpose of the statutory scheme." *Stirling,* 571 F.2d at 728 (citation omitted). Second, the regulated parties—commercial and investment entities—were not a " 'highly selective group inherently suspect of criminal activities.' " *Id.* Third, the regulated activity—the sale of stock—was inherently lawful. *Id.*

■ We agree with *Stirling* 's analysis of the *Byers* factors as applied in the securities law context. The disclosure requirements contained in Sections 10(b) and 15(d) of the Securities Exchange Act and related regulations do not target a "highly selective group inherently suspect of criminal activities," *Byers,* 402 U.S. at 430, 91 S.Ct. at 1539 (internal quotations omitted), nor do they regulate an activity that is "permeated with criminal statutes." *Id.* Although disclosure might have revealed past criminal violations *in this case,* the disclosure requirement does not, in general, mandate revelation of "inherently illegal activity." *Bouknight,* 493 U.S. at 557, 110 S.Ct. at 906. We therefore conclude that the disclosure requirements in this case did not violate Wheeler's Fifth Amendment privilege against self-incrimination.

**c. Scienter of the Primary Violators**

■ Finally, Fehn argues that Wheeler lacked the requisite scienter for commission of the primary violation, for he insists that Wheeler relied on Fehn's professional advice that disclosure of past securities law violations was unnecessary under the regulations and was precluded by the Fifth Amendment privilege against self-incrimination. We disagree. The record reflects that Wheeler adamantly refused to disclose the SEC investigation and the contingent liabilities stemming from past violations. The requisite scienter therefore existed. *See Aaron v. SEC,* 446 U.S. 680, 689–90, 100 S.Ct. 1945, 1951–52, 64 L.Ed.2d 611 (1980) (citing *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 197–99, 96 S.Ct. 1375, 1382–84, 47 L.Ed.2d 668 (1976)).

**2. Fehn's "Substantial Assistance" in the Primary Violation**

■ The term "substantial assistance" has been interpreted to include "participation in the editing" of information for the purpose of marketing securities. *Molecular Technology Corp. v. Valentine,* 925 F.2d 910, 918 (6th Cir.1991). Fehn admits that he reviewed the initial draft Form 10–Q prepared by Wheeler's non-lawyer employee, and admits that he personally altered that document. Although he claims to have had less involvement in the preparation of subsequent Form 10–Q's, these documents, too, reflect Fehn's editing notations, and were prepared by Fehn's law firm. Because Fehn had a hand in the editing the Form 10–Q's, and because he failed to properly advise Wheeler and CTI of the

material omissions in the Form 10–Q's, instead submitting those forms to the SEC for filing, we conclude that Fehn lent the requisite "substantial assistance" to the primary violation of Section 10(b) and Section 15(d) of the Securities Exchange Act and related regulations.

Fehn urges us that he acted in good faith in rendering professional advice to CTI and Wheeler, and that this alleged good faith precludes a finding that he rendered "substantial assistance" in the primary violations of Sections 10(b) and 15(d). He relies on *In re Carter and Johnson*, [1981] Fed. Sec. L. Rptr. (CCH) ¶ 82,847 (Feb. 28, 1981), in which the SEC explained that "[s]o long as a lawyer is acting in good faith and exerting reasonable efforts to prevent violations of the law by his client, his professional obligations have been met." *Carter*, at ¶¶ 84,172–73. We reject Fehn's argument because we find that his efforts were not "reasonable" in light of the well-established disclosure requirements imposed by the aforementioned SEC regulations. Rules 10b–5 and 12b–20 clearly prohibited the misstatements and omissions contained in CTI's Form 10–Q's.

We observe, furthermore, that effective regulation of the issuance and trading of securities depends, fundamentally, on securities lawyers such as Fehn properly advising their clients of the disclosure requirements and other relevant provisions of the securities regulations. Securities regulation in this country is premised on open disclosure, and it is therefore incumbent upon practitioners like Fehn to be highly familiar with the disclosure requirements and to insist that their clients comply with them.

We acknowledge the inherent tension between representing a client in criminal or civil litigation—which entails professional obligations such as the duty of confidentiality and the need to advise clients of their privilege against self-incrimination—and counseling a client in connection with regulatory compliance. Commentators have described the tension that arises where a lawyer is called upon to perform a "legal audit" of his own client, such as when a lawyer advises an issuer of securities about the need to disclose certain negative corporate information:

What is unusual about such employment, of course, is that the client has in effect hired the lawyer for the very purpose of revealing information that otherwise would be confidential.

Geoffrey C. Hazard, Jr. & W. William Hodes, 1 *The Law of Lawyering: A Handbook on the Model Rules of Professional Conduct* § 2.3, at 101 (Aspen Law & Business, 2nd ed. 1990).

This dilemma is especially pronounced in cases where, as here, a lawyer attempts to represent a client in an SEC investigation of previous disclosure violations and, at the same time, attempts to advise that same client as to ongoing disclosure requirements. We note that ABA Model Rule of Professional Conduct 2.3 makes a special provision for cases where a lawyer is asked by a client to evaluate that client's internal information for the use of an outside party, such as a government agency. Model Rule 2.3(a)(1) provides that

[a] lawyer *may undertake an evaluation* of a matter affecting a client for the use of someone other than the client *if . . . the lawyer reasonably believes that making the evaluation is compatible* with other aspects of the lawyer's relationship with the client. (emphasis added)

In offering an example of the practical implications that flow from this requirement, the Comment to Model Rule 2.3 cautions that

[I]f the lawyer is acting as advocate in defending the client against charges of fraud, it would normally be incompatible with that responsibility for the lawyer to perform an evaluation for others concerning the same or a related transaction.

We express no opinion as to whether Fehn's representation of Wheeler and CTI in connection with the SEC investigation was "compatible" with counseling these same parties about compliance with SEC disclosure requirements. What *is* clear, however, is that the SEC disclosure requirements mandated disclosure of Wheeler's role as CTI's promoter and of the contingent liabilities stemming from CTI's and Wheeler's earlier securities law violations. In failing to make the Form 10–Q's comply with these disclo-

sure requirements, Fehn "substantially assist[ed]" in the primary disclosure violations.

### 3. Fehn's Scienter in Aiding and Abetting the Primary Violation

The new Section 104, in authorizing SEC injunctive actions against aiders and abettors of the securities laws, makes clear that the requisite scienter for aiding and abetting liability is "knowingly." This requirement is in keeping with the traditional scienter necessary to give rise to aiding and abetting liability under Section 10(b). *See Hauser*, 14 F.3d at 1343 (requiring "actual knowledge" of the primary wrong and of the aider and abettor's "role in furthering [that violation]").

■ Fehn's knowledge of the primary violations was plainly established in this case. First, Fehn knew that the representations in CTI's registration statement with respect to Wheeler's role as promoter were inaccurate. In light of the information Fehn possessed when he undertook to review and edit the Form 10–Q's, Fehn must have known that the Form 10–Q's he helped to prepare perpetuated this inaccuracy and, furthermore, contained additional untrue statements about Wheeler's historical relationship with CTI. Second, Fehn knew there was material information about CTI that Wheeler did not wish to disclose in the quarterly Form 10–Q reports, since Wheeler informed Fehn in no uncertain terms of his refusal to disclose in the Form 10–Q's his potential liability for past securities law violations. The "knowledge" element was therefore clearly established in this case.

### III. The Entry of the Permanent Injunction against Fehn

■ Fehn's final challenge to the permanent injunction is that the district court abused its discretion in entering a permanent injunction against him because it erroneously failed to consider facts relevant to the propriety of a permanent injunction. The granting or denying of injunctive relief "rests within the sound discretion of the trial court." *SEC v. Goldfield Deep Mines Co. of Nevada*, 758 F.2d 459, 465 (9th Cir.1985) (citing *SEC v. Arthur Young & Co.*, 590 F.2d 785, 787 (9th

Cir.1979)). A district court's grant of permanent injunctive relief is therefore reviewed for an abuse of discretion or application of an erroneous legal principle. *United States v. Yacoubian*, 24 F.3d 1, 3 (9th Cir.1994).

We first consider what factors we must examine in evaluating the propriety of the district court's decision to permanently enjoin Fehn from the future aiding and abetting of violations of Sections 10(b) and 15(d) of the Securities Exchange Act. Before Congress enacted Section 104 of the Private Securities Litigation Reform Act, we followed the standard outlined in *SEC v. Murphy*, 626 F.2d 633 (9th Cir.1980). We conclude that this standard remains appropriate in the context of Section 104, since we can find no indication that Congress, in enacting Section 104, intended to vary the pre-*Central Bank* standard for injunctive actions.

■ To obtain a permanent injunction, the SEC "had the burden of showing there was a reasonable likelihood of future violations of the securities laws." *Id.* at 655 (citations omitted). We acknowledge that there is "[n]o per se rule requiring the issuance of an injunction upon the showing of [a] past violation," *SEC v. Koracorp Indus., Inc.*, 575 F.2d 692 (9th Cir.), *cert. denied*, 439 U.S. 953, 99 S.Ct. 348, 58 L.Ed.2d 343 (1978), but, as we explained in *Murphy*, "[t]he existence of past violations may give rise to an inference that there will be future violations; and the fact that the defendant is currently complying with the securities laws does not preclude an injunction." *Murphy*, 626 F.2d at 655.

■ In "predicting the likelihood of future violations," we must assess "the totality of the circumstances surrounding the defendant and his violations," and we consider such factors as

(1) the degree of scienter involved; (2) the isolated or recurrent nature of the infraction; (3) the defendant's recognition of the wrongful nature of his conduct; (4) the likelihood, because of defendant's professional occupation, that future violations

might occur; (5) and the sincerity of his assurances against future violations.

*Id.* (citations omitted).

 Applying these factors to this case, we conclude that the evidence was adequate to support the permanent injunction issued by the district court. Although the second factor weighs in Fehn's favor, since the SEC cites no other securities law violations on Fehn's part, other factors weigh against him. First, it was established at trial that Fehn aided and abetted violations of key antifraud and disclosure provisions of the Securities Exchange Act. Second, as discussed above, the SEC established that Fehn possessed the requisite knowledge to aid and abet the primary violations by CTI and Wheeler. Although Fehn denies, and the SEC does not allege, that he intended to defraud investors, that degree of scienter is not necessary to prove aiding and abetting. Third, Fehn's lack of remorse is apparent in his continued insistence on the validity of his advice to Wheeler with respect to the scope of the Fifth Amendment privilege. Fourth, Fehn's professional occupation tends to suggest a risk of future violations, since a significant portion of his past practice involved representing clients in connection with the Securities Exchange Act of 1934. Finally, the sincerity of Fehn's assurances against future violations is difficult to gauge, but we note that sincere assurances of an intent to refrain from aiding and abetting future violations are insufficient, without more, to militate against an injunction. *Id.* at 656.

Based on our consideration of the relevant factors, we conclude that the district court did not abuse its discretion in permanently enjoining Fehn from future violations. Although Fehn has foresworn future violations, in our view, other factors ultimately weigh in favor of the injunction entered below.

## CONCLUSION

We affirm the district court's final judgment against Fehn and its order permanently enjoining Fehn from future aiding and abetting of violations of Sections 10(b) and 15(d) of the Securities Exchange Act of 1934 and related regulations.