[No. D058933. Fourth Dist., Div. One. Apr. 12, 2012.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMES KURTENBACH, Defendant and Appellant.

1266

## Counsel

Patrick Morgan Ford, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Lilia E. Garcia and Lynne G. McGinnis, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**IRION, J.**—A jury convicted James Kurtenbach of conspiracy to commit arson (Pen. Code, § 182, subd. (a)(1));[1] arson causing great bodily injury (§ 451, subd. (a)); concealing or knowingly failing to disclose an event affecting an insurance benefit (§ 550, subd. (b)(3)); and vandalism (§ 594, subds. (a), (b)(1)). The jury also made true findings that in committing the arson Kurtenbach used a device designed to accelerate the fire (§ 451.1, subd. (a)(5)) and acted for pecuniary gain (§ 456, subd. (b)). The trial court imposed a prison sentence of 15 years eight months.

Kurtenbach contends (1) the trial court prejudicially erred by failing to instruct the jury regarding aiding and abetting with respect to the count for arson causing great bodily injury; (2) insufficient evidence supports the conviction for arson causing great bodily injury because the only person injured in the fire was an accomplice to the arson; (3) pouring gasoline in a structure prior to starting a fire does not support a finding that the arson was "caused by use of a device designed to accelerate the fire" for the purposes of the sentencing enhancement set forth in section 451.1, subdivision (a)(5); (4) the trial court erred in instructing the jury on the vandalism count; (5) the conviction for concealing or knowingly failing to disclose an event affecting

---

[1] Unless otherwise indicated, all further statutory references are to the Penal Code.

an insurance benefit (§ 550, subd. (b)(3)) violated his federal constitutional privilege against self-incrimination and his right to due process; (6) the sentences imposed for the vandalism conviction and the conviction for concealing or knowingly failing to disclose an event affecting an insurance benefit should have been stayed under section 654 because they arose from the same course of conduct as the arson conviction; and (7) in imposing the upper term for the arson conviction, the trial court improperly relied on aggravating factors that were elements of the crime.

We conclude that the trial court should have stayed execution of the eight-month sentence for the vandalism conviction pursuant to section 654, but that Kurtenbach's remaining arguments lack merit. We therefore direct the trial court to modify the judgment to stay execution of the sentence on the vandalism conviction. As modified, the judgment is affirmed.

I

FACTUAL AND PROCEDURAL BACKGROUND

A house that Kurtenbach owned as a rental property was destroyed by fire in the early morning of October 31, 2008. The fire began with a powerful explosion and quickly proceeded to engulf the entire house in flames and destroy it. A neighboring house sustained over $100,000 in damage. Joseph Nesheiwat, who was in the house to ignite the fire, died in the explosion and fire.

Nesheiwat was an employee of a gas station that Kurtenbach owned. In their investigation of the incident, the police obtained information leading them to suspect that Kurtenbach had solicited Nesheiwat to burn down the house. According to arson experts, the fire was fueled by gasoline.

Kurtenbach was tried before a jury on charges of murder (§ 187, subd. (a)); conspiracy to commit arson (§ 182, subd. (a)(1)); arson causing great bodily injury (§ 451, subd. (a)); presenting a false insurance claim (§ 550, subd. (a)(1)); concealing or knowingly failing to disclose an event affecting an insurance claim (§ 550, subd. (b)(3)); and vandalism (§ 594, subds. (a), (b)(1)).

Among the evidence at trial, Kurtenbach's son, Justin, testified that Kurtenbach had asked him and Nesheiwat to burn down the house, but that Justin had declined to participate. Justin testified that he heard Kurtenbach and Nesheiwat talking about using gasoline to fuel the fire. Nesheiwat's brother, John, testified that at the request of Kurtenbach he drove his brother to the house early in the morning of October 31, 2008, so that his brother

could ignite the fire, and that Kurtenbach had promised to compensate him and his brother for their participation. According to John, Kurtenbach told him that he and Nesheiwat had poured gasoline in the house. Witnesses saw Kurtenbach fill up jugs with gasoline and put them in his truck one or two days before the fire.

Among the evidence that Kurtenbach presented in his defense was the testimony of a witness who stated that Nesheiwat had said he was going to burn down the house, without Kurtenbach's knowledge, to help Kurtenbach financially.

With respect to the counts relating to insurance fraud (§ 550, subds. (a)(1), (b)(3)), the evidence was that Kurtenbach's homeowners insurance agent had filed a claim for Kurtenbach after she learned of the fire from a source other than Kurtenbach, and that Kurtenbach thereafter spoke with an insurance adjuster about facts relating to the claim. Kurtenbach's last communication with the insurance adjuster was in December 2008, when Kurtenbach informed the adjuster that he was represented by legal counsel.

In a motion made pursuant to section 1118.1 after the close of the People's evidence, the trial court entered a judgment of acquittal on the charge of presenting a false insurance claim (§ 550, subd. (a)(1)) on the ground of insufficient evidence, as there was no evidence that Kurtenbach filed a claim or directed someone to do so on his behalf. The other insurance fraud claim—based on the allegation that Kurtenbach concealed or knowingly failed to disclose an event affecting an insurance benefit (§ 550, subd. (b)(3))—was presented to the jury.

The jury was unable to reach a verdict on the murder count, but it convicted Kurtenbach on the remaining counts and made true findings that in committing the arson, Kurtenbach used a device designed to accelerate the fire (§ 451.1, subd. (a)(5)) and acted for pecuniary gain (§ 456, subd. (b)). The trial court declared a mistrial with respect to the murder count, and that count was eventually dismissed with prejudice. The trial court sentenced Kurtenbach to prison for a term of 15 years eight months.

## II

## DISCUSSION

A. *The Trial Court Did Not Prejudicially Err by Omitting a Jury Instruction on Aiding and Abetting for the Arson Count*

We first consider Kurtenbach's contention that the trial court prejudicially erred by failing to instruct the jury regarding aiding and abetting with respect to the count for arson causing great bodily injury.

Kurtenbach was charged in count 3 with committing arson causing great bodily injury. According to the applicable statute, "[a] person is guilty of arson when he or she willfully and maliciously sets fire to or burns or causes to be burned or who aids, counsels, or procures the burning of, any structure . . . ." (§ 451.)

According to the prosecutor's closing argument, Kurtenbach was guilty of arson on the theory that he "counseled, helped or caused" the burning of the house. The jury was accordingly instructed that to prove arson causing great bodily injury, the People must prove, in addition to the great bodily injury, that "[t]he defendant set fire to or burned or counseled, helped or caused the burning of a structure" and that "[h]e acted willfully and maliciously . . . ." The trial court instructed the jury on the principles of aiding and abetting, but it stated that the instruction applied only to the vandalism count.

Relying on *People v. Sarkis* (1990) 222 Cal.App.3d 23 [272 Cal.Rptr. 34] (*Sarkis*), Kurtenbach contends that because the jury was instructed that he could be found guilty of arson under the theory that he "counseled" or "helped" the burning of a structure, the trial court was required to instruct, sua sponte, on the principles of aiding and abetting with respect to the arson count.

We note initially that *Sarkis* does not, as Kurtenbach contends, stand for the proposition that when a jury is instructed that a defendant may be found guilty of arson on the theory that he "counseled" or "helped" the burning of a structure, the trial court must sua sponte instruct the jury on the principles of aiding and abetting. On the contrary, *Sarkis* expressly declined to reach that issue. In *Sarkis*, the jury was instructed on the definition of arson, to include someone who " 'aids, counsels or procures the burning of any structure.' " (*Sarkis, supra*, 222 Cal.App.3d at p. 27, italics omitted.) But it was also instructed that the defendant could be found guilty if he " 'aided and abetted the commission of the offense.' " (*Ibid.*, italics omitted.) *Sarkis* held that the trial court erred by introducing the concept of aiding and abetting liability but not providing a *definition* of aiding and abetting, including the concepts of knowledge and intent. (*Id.* at p. 28.) *Sarkis* expressly stated, "[w]e are not presented with, and do not pass upon, the question of the intent required of one who aids, counsels or procures the burning of a structure as defined in [the arson statute]." (*Id.* at p. 28, fn. 2.) *Sarkis* explained that "[w]hether such intent is identical to that required of one who 'aids and abets' the commission of other types of crimes is immaterial here in view of the fact the jury was instructed . . ." that the defendant could be found guilty under a theory of

aiding and abetting, and that fact alone "warrants our conclusion the omitted instruction [defining aiding and abetting] should have been given." (*Ibid.*)[2]

In this case, we need not, and do not, reach the issue that *Sarkis* declined to reach, namely whether the trial court must instruct on the principles of aiding and abetting when an arson prosecution proceeds under the theory that the defendant counseled, aided or procured the burning of a structure.[3] Here, as we will explain, any error in failing to give such an instruction was harmless under the applicable standard set forth in *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824]. (See *People v. Sengpadychith* (2001) 26 Cal.4th 316, 324 [109 Cal.Rptr.2d 851, 27 P.3d 739] ["a trial court's failure to instruct on an element of a crime is federal constitutional error [citation] that requires reversal of the conviction unless it can be shown 'beyond a reasonable doubt' that the error did not contribute to the jury's verdict . . ." (italics omitted)]; *Sarkis, supra*, 222 Cal.App.3d at pp. 28–29 [applying *Chapman* harmless error standard when trial court erred in failing to instruct on definition of aiding and abetting].)

■ As reflected in the jury instructions on aiding and abetting that the trial court provided for the vandalism count, if the jurors had been instructed on the theory of aiding and abetting as applied to the arson count, they would have been instructed that the People must prove, with respect to Kurtenbach's state of mind, that "[t]he defendant knew that the perpetrator intended to commit the crime," and "[b]efore or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime . . . ."[4] The law requires that "an aider and abettor act with knowledge

---

[2] It is noteworthy that despite *Sarkis*'s express statement that it was not reaching the issue of whether an instruction on intent identical to that found in the aiding and abetting instruction should be given when a defendant is charged with arson on the theory that he aided, counseled or procured the burning of a structure, the bench notes to the CALCRIM instructions on arson—citing *Sarkis* as the sole support—state that "[i]f the prosecution's theory is that the defendant did not set the fire but 'counseled,' 'helped,' or 'caused' the fire, the court has a sua sponte duty to instruct on aiding and abetting." (Judicial Council of Cal., Crim. Jury Instns. (2011) Bench Notes to CALCRIM Nos. 1501, 1502, 1515, pp. 1173, 1175, 1178, boldface omitted.)

[3] Although we do not reach the issue of the required mental state for a defendant who commits arson by aiding, counseling or procuring the burning of a structure, any such analysis would focus on *People v. Atkins* (2001) 25 Cal.4th 76, 84 [104 Cal.Rptr.2d 738, 18 P.3d 660], in which our Supreme Court concluded that arson as defined in section 451 is a general intent crime.

[4] Similarly, the jury would further have been instructed with respect to the arson count that "[s]omeone aids and abets a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does, in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime."

of the criminal purpose of the perpetrator and with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense." (*People v. Beeman* (1984) 35 Cal.3d 547, 560 [199 Cal.Rptr. 60, 674 P.2d 1318], italics omitted.) Focusing on these requirements, Kurtenbach argues that because of the absence of an aiding and abetting instruction for the arson count, "the jury was never instructed on the need to find [Kurtenbach] had knowledge of [Nesheiwat's] intent to burn the house at the time he did so." Kurtenbach asserts that the jury thus may have convicted him of "helping" or "counseling" or "causing" the burning of the house, even if they concluded that Kurtenbach *unwittingly* inspired Nesheiwat to commit arson.[5]

In light of findings that the jury necessarily made in convicting Kurtenbach of arson and conspiracy to commit arson, any error in omitting an aiding and abetting instruction for the arson count was harmless beyond a reasonable doubt. (See *People v. Garcia* (2001) 25 Cal.4th 744, 761 [107 Cal.Rptr.2d 355, 23 P.3d 590] [an error in failing to instruct on an element of the offense is harmless "when the reviewing court can determine beyond a reasonable doubt, based on jury findings that may be inferred from other instructions, that the instructional error did not contribute to the verdict"].) According to the applicable instructions, in convicting Kurtenbach of conspiracy to commit arson in count 2, the jury necessarily found that Kurtenbach "intended to agree and did agree with John Nesheiwat and Joseph Nesheiwat to commit arson" and that "[a]t the time of the agreement, [Kurtenbach] and one or more of the other alleged members of the conspiracy intended that one or more of them would commit arson . . . ." In addition, according to the instruction for the arson count, the jury necessarily found that Kurtenbach "acted willfully and maliciously" when he "set fire to or burned or counseled, helped or caused the burning of a structure."

In light of the jury's findings that Kurtenbach (1) *intended* that an arson be committed and (2) acted *willfully and maliciously* in connection with the arson, we conclude that, had the jury been instructed that the aiding and abetting instructions applied to count 3, it necessarily would have found that Kurtenbach "knew that the perpetrator intended to commit the crime" and "intended to aid and abet the perpetrator in committing the crime," as required under the principles of aiding and abetting. The jury's findings show that it unequivocally rejected defense counsel's argument that Kurtenbach unknowingly inspired Nesheiwat to commit arson as a favor to him, and instead concluded that Kurtenbach knowingly participated in a plan to burn

---

[5] Several witnesses testified that during a 2007 wildfire, which came relatively close to Kurtenbach's house, Kurtenbach said in a joking manner that he wished the wildfire would burn down the house. Kurtenbach points to this testimony, implying that Nesheiwat may have decided, on his own, to burn down the house after hearing Kurtenbach's statement.

down the house. Therefore, any error in failing to instruct on an aiding and abetting theory for the arson count was harmless beyond a reasonable doubt.

B. *Injuries to an Accomplice Are Not Excluded from the Offense of Arson Causing Great Bodily Injury*

Kurtenbach contends that insufficient evidence supports a finding that he committed arson causing great bodily injury in violation of section 451, subdivision (a), because the only great bodily injury caused by the fire was to Nesheiwat, who was an accomplice to the arson.

 Section 451, subdivision (a) sets forth the crime of "[a]rson that causes great bodily injury."[6] The statute contains no limitations on the type of great bodily injury required for a violation of section 451, subdivision (a). Nonetheless, Kurtenbach contends that we should imply an exclusion for great bodily injury incurred by an accomplice to the arson. Statutory interpretation presents a question of law, which we review de novo. (*People v. Johnson* (2007) 150 Cal.App.4th 1467, 1474 [59 Cal.Rptr.3d 405].)

In support of his interpretation of section 451, subdivision (a), Kurtenbach relies on two statutes—section 12022.7, subdivision (a) and section 12022.53, subdivision (d)—that impose increased punishment in cases of great bodily injury, but that specifically exclude injury to an accomplice.[7] Kurtenbach also points out that section 1192.7, subdivision (c)(8), with certain exceptions, prohibits plea bargaining for a "serious felony," which is defined to include "any felony in which the defendant personally inflicts great bodily injury on any person, *other than an accomplice*" (*ibid.*, italics added), and that Vehicle Code section 23153, subdivisions (a) and (b) set forth the crime of driving while under the influence while committing an act forbidden by law and causing bodily injury "to any person *other than the driver*" (*ibid.*, italics added). Kurtenbach contends that in light of the language in these statutes, the Legislature must have intended to take the same approach in section 451,

---

[6] Arson causing great bodily injury is punishable by imprisonment in the state prison for five, seven or nine years. (§ 451, subd. (a).) Other types of arson, not charged in this case—although arguably applicable—provide for shorter terms of imprisonment. (See, e.g., § 451, subd. (c) ["[a]rson of a structure . . . is a felony punishable by imprisonment in the state prison for two, four, or six years"].)

[7] Section 12022.7, subdivision (a) states: "Any person who personally inflicts great bodily injury on any person *other than an accomplice* in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for three years." (Italics added.) Section 12022.53, subdivision (d) increases the punishment in certain cases where the intentional discharge of a firearm causes great bodily injury, or death, "to any person *other than an accomplice*" (italics added).

subdivision (a), but because of a "likely . . . oversight" did not expressly include an exclusion for great bodily injury to an accomplice.

■ We reject Kurtenbach's argument. "A venerable canon of statutory interpretation provides: ' " " "Where a statute, with reference to one subject contains a given provision, the omission of such provision from a similar statute concerning a related subject . . . is significant to show that a different intention existed." ' " ' " (*Collins v. Department of Transportation* (2003) 114 Cal.App.4th 859, 867 [8 Cal.Rptr.3d 132].) Applying that rule of interpretation here, we infer from the fact that the Legislature *did not* include an exclusion for great bodily injury to an accomplice in section 451, subdivision (a), but *did* include such an exclusion in other statutes, that the Legislature did *not* intend to create an exclusion for great bodily injury to an accomplice in section 451, subdivision (a).

In support of his argument that the Legislature made an unintentional *oversight* in omitting language excluding great bodily injury to an accomplice from section 451, subdivision (a), Kurtenbach argues that section 451, subdivision (a) includes another instance of inexact drafting. Specifically, Kurtenbach points out that many statutes referring to great bodily injury use the phrase "great bodily injury or death," but in section 451, subdivision (a), the Legislature neglected to include "or death." (See §§ 12022.53, subd. (d) [sentencing enhancement when the intentional discharge of a firearm causes "great bodily injury . . . or death"], 273a [referring to child abuse "under circumstances or conditions likely to produce great bodily harm or death"], 368, subd. (b)(1) [referring to elder abuse "under circumstances or conditions likely to produce great bodily harm or death"]; Veh. Code, § 23558 [sentencing enhancement for a person who, while driving under the influence or committing vehicular manslaughter, causes "bodily injury or death" to more than one victim]; Bus. & Prof. Code, § 25658, subd. (c) [misdemeanor to furnish alcohol to a minor who thereafter causes great bodily injury or death].)

■ We reject the fundamental premise of Kurtenbach's argument because we find no legislative oversight in the omission of the phrase "or death." The most widely applicable statute creating a sentence enhancement for great bodily injury does not include the phrase "or death" (see § 12022.7, subd. (a) [providing for a sentence enhancement for "great bodily injury" in the commission of a felony]), and case law establishes that death is a type of great bodily injury (see *People v. Valencia* (2000) 82 Cal.App.4th 139, 145 [98 Cal.Rptr.2d 37] [death by gunshot wound was great bodily injury].) As there

is no reason to believe that the Legislature committed an oversight in omitting the phrase "or death" from section 451, subdivision (a), there is no basis for Kurtenbach's contention that the Legislature must also have committed an oversight in failing to include language excluding great bodily injury to an accomplice from that provision.

As another argument in support of his reading of the statute, Kurtenbach argues that we should rely on case law concerning the felony-murder rule when determining whether to imply an exclusion for great bodily injury to an accomplice in section 451, subdivision (a). Specifically, Kurtenbach points to case law that has focused on the issue of whether the felony-murder rule applies when an accomplice to an arson dies in the fire. (See, e.g., *People v. Billa* (2003) 31 Cal.4th 1064, 1072 [6 Cal.Rptr.3d 425, 79 P.3d 542] [concluding that "felony-murder liability for any death in the course of arson attaches to all accomplices in the felony at least where . . . one or more surviving accomplices were present at the scene and active participants in the crime"]; *People v. Ferlin* (1928) 203 Cal. 587 [265 P. 230].) These cases and their reasoning are not applicable because the issue before us is *not*, as it is in a felony-murder context, whether there has been a " 'killing "of another" ' " for the purposes of felony murder when an accomplice dies in a fire. (*Billa*, at p. 1072.) Instead, the issue is whether there is any basis in the statutory language of section 451, subdivision (a) to conclude that the Legislature intended to exclude injury to an accomplice from the meaning of "great bodily injury." As we have explained, the language of section 451, subdivision (a) simply is not susceptible to the interpretation that Kurtenbach advances.

■ In sum, because section 451, subdivision (a) applies to great bodily injury to an accomplice to an arson, sufficient evidence supports Kurtenbach's conviction under that statute.

C. *Pouring Gasoline in a Structure to Fuel an Arson Is the Use of a Device Designed to Accelerate the Fire for the Purposes of the Sentencing Enhancement in Section 451.1, Subdivision (a)(5)*

■ In connection with the arson count (§ 451, subd. (a)), the information alleged a sentencing enhancement under section 451.1, subdivision (a)(5), which provides for a three-, four- or five-year enhancement if the arson "was caused by use of a device designed to accelerate the fire or delay ignition."

The prosecution's theory was that pouring gasoline in the house prior to the arson was the use of a device designed to accelerate the fire. The trial

court instructed the jury that "a device designed to accelerate the fire means a piece of equipment or a mechanism intended, or devised, to hasten or increase the fire's progress and can include gasoline poured from a container prior to the start of a fire." The jury made a true finding on the enhancement.

Kurtenbach contends that the trial court improperly instructed the jury that "gasoline poured from a container prior to the start of a fire" constitutes a device designed to accelerate the fire within the meaning of section 451.1, subdivision (a)(5).

Much of the briefing focuses on whether the use of a *container* to pour gasoline into the house constituted the use of a device designed to accelerate the fire within the meaning of section 451.1, subdivision (a)(5). In our view, the analytical focus should not be on whether a *container* holding gasoline that is poured at the scene of an arson constitutes the use of a device designed to accelerate a fire. A container will almost always be involved when gasoline is used to fuel a fire because gasoline is a liquid that must be transported in something to the scene of an arson. Instead of focusing on the container, we focus on the more fundamental issue of whether the use of gasoline to help fuel a fire—*no matter how it is contained and dispersed*—constitutes the use of a device designed to accelerate the fire.

Section 451.1, subdivision (a)(5) was enacted in 1994. (Stats. 1994, ch. 421, § 2, p. 2299.) The only case law interpreting the phrase "use of a device designed to accelerate the fire" is *People v. Andrade* (2000) 85 Cal.App.4th 579 [102 Cal.Rptr.2d 254] (*Andrade*). In *Andrade*, witnesses testified that the defendant started a fire either by using a Molotov cocktail or breaking a gasoline-filled bottle by throwing it on the floor and then lighting a match. *Andrade* reviewed the legislative history showing that the purpose of section 451.1, subdivision (a)(5) was to increase penalties for " ' "the worst arsonists who exhibit a specific intent to inflict damage," ' " and it consulted the dictionary definitions of "device," "design" and "accelerate." (*Andrade*, at pp. 586, 587.) *Andrade* concluded that a " 'device designed to accelerate the fire' (§ 451.1, subd. (a)(5)) means a piece of equipment or a mechanism intended, or devised, to hasten or increase the progress of the fire." (*Id.* at p. 587.) Applying that definition, *Andrade* held that under either scenario— either the use of a Molotov cocktail or dispersing gasoline by breaking a bottle—the jury would necessarily have to find that the defendant had used a device designed to accelerate the fire. (*Id.* at pp. 585, 589.) *Andrade* stressed that breaking the gasoline-filled bottle constituted the use of a device designed to accelerate a fire because the jury "could properly have found that defendant intended the bottle containing the accelerant gasoline to serve as a missile or projectile, whose purpose was to disperse the accelerant at a distance farther away from him and/or over a greater surface area than could

be otherwise achieved" and "[d]ispersal of a fire accelerant at a greater distance and/or over a greater area would serve to accelerate, i.e., hasten or increase, the fire's spread." (*Id.* at p. 589.)

Because *Andrade* involved the unique situation of a glass bottle thrown down and broken to disperse gasoline, it did not decide the more basic question presented here, namely whether using gasoline to fuel a fire—no matter how it is contained or dispersed—constitutes the use of a device designed to accelerate the fire. Our task in interpreting a statute is to ascertain the legislative intent. (*Klein v. United States of America* (2010) 50 Cal.4th 68, 77 [112 Cal.Rptr.3d 722, 235 P.3d 42].) It is unclear from the statutory language whether the Legislature intended to include gasoline within the scope of devices designed to accelerate a fire. Therefore, we may turn to the legislative history to inform our interpretation. (*Ibid.*)

As *Andrade* observed in its review of the legislative history, among the purposes of the law was to "increas[e] the penalties for arsonists who exhibit a specific intent to inflict damage." (*Andrade, supra,* 85 Cal.App.4th at p. 586.) Because gasoline is used in connection with an arson to increase the strength and destructive power of the fire, it is consistent with the legislative intent to view the use of gasoline in connection with an arson as the use of a device designed to accelerate a fire within the meaning of the sentencing enhancement.

Our review of the legislative history confirms that the Legislature understood the use of a flammable liquid, such as gasoline, in connection with an arson, to constitute the use of a device designed to accelerate the fire within the meaning of the sentencing enhancement. Specifically, when discussing the types of conduct that would come within the sentencing enhancements created by the bill, an Assembly committee analysis referred to the act of setting a fire and "using lighter-fluid to accelerate that fire." (Assem. Com. on Public Safety, Analysis of Sen. Bill No. 1309 (1993–1994 Reg. Sess.) as amended Aug. 10, 1994, p. 5.)

 As the use of gasoline in connection with an arson exhibits "a specific intent to inflict damage" (*Andrade, supra,* 85 Cal.App.4th at p. 586) and is comparable to the use of lighter fluid to fuel a fire, we conclude based on the legislative history of section 451.1, subdivision (a)(5) that the act of pouring gasoline in a structure in connection with an arson is the "use of a device designed to accelerate the fire" within the meaning of section 451.1, subdivision (a)(5). The trial court properly instructed the jury.

D. *The Trial Court Properly Instructed the Jury on the Vandalism Count*

The next issue is whether the trial court erred in its instruction to the jury on the vandalism count in response to an inquiry during jury deliberations.

Kurtenbach was convicted of vandalism based on the damage to the neighbors' house that resulted from the fire. Among other things, the neighbors' house had windows blown out in the explosion, suffered interior and exterior cracking, and incurred water damage, resulting in repair costs exceeding $100,000.

■ Kurtenbach was convicted under section 594, subdivision (a), which provides that a defendant commits vandalism when he maliciously damages or destroys any real or personal property that is not his own. (§ 594, subd. (a)(2), (3).)

In the motion for a judgment of acquittal pursuant to section 1118.1 at the close of the prosecution's case, defense counsel argued that the vandalism count had not been proven because the prosecution had not established that Kurtenbach intended to harm the neighbors' house. The trial court denied the motion as to the vandalism count, concluding that the malice required for vandalism need not be directed at a particular victim.

The jury was instructed with CALCRIM No. 2900, which states, among other things, that (1) to prove vandalism the People must prove that "[t]he defendant maliciously damaged or destroyed real or personal property . . ." and (2) "[s]omeone acts maliciously when he or she intentionally does a wrongful act or when he or she acts with the unlawful intent to annoy or injure someone else."

During deliberations the jury inquired with respect to the vandalism count, "Does the 'wrongful act' need to be directed towards property not owned by the defendant?" The trial court responded, "The wrongful act need not be 'directed' towards anyone. However, the property damaged must be someone else's other than the defendant's."[8]

Kurtenbach argues that this response was in error because "vandalism requires that a defendant act maliciously toward the victim," and the trial court should have responded to the jury "that a wrongful act need be directed towards the victim of the damage."

Kurtenbach's sole citation in support of his argument is the Penal Code's general definition of "malice" and "maliciously" as "a wish to vex, annoy, or

---

[8] In the same note, the jury also asked the trial court to "clarify element 1" of the vandalism instruction, which required a finding that "[t]he defendant maliciously damaged or destroyed real or personal property . . . ." The trial court responded by referring the jury to the definition of "malicious" in the instruction, and specifically by directing the jury's attention "to the word 'or' " in that definition. The trial court was referring to the instruction stating that "[s]omeone acts maliciously when he or she intentionally does a wrongful act *or* when he or she acts with the unlawful intent to annoy or injure someone else." (Italics added.)

injure another person, or an intent to do a wrongful act, established either by proof or presumption of law." (§ 7, subd. 4.)

 The definition of malice does not support Kurtenbach's argument. To commit vandalism a defendant must do an act "maliciously." (§ 594, subd. (a).) However, as we have stated, a person acts maliciously *either* when acting with "a wish to vex, annoy, or injure another person" *or* with the "intent to do a wrongful act." (§ 7, subd. 4.) As our Supreme Court has explained, the first type of malice described in section 7, subdivision 4, is known as "[m]alice in fact" and "consists of actual ill will or intent to injure." (*In re V.V.* (2011) 51 Cal.4th 1020, 1028 [125 Cal.Rptr.3d 421, 252 P.3d 979].) However, the second type of malice described in section 7, subdivision 4, is known as "malice in law." (*In re V.V.*, at p. 1028.) "Malice in law may be 'presumed' or 'implied' from the intentional doing of the act without justification or excuse or mitigating circumstances." (*Ibid.*)

Based on the definition of "malice" contained in section 7, subdivision 4, in making a finding on whether Kurtenbach acted maliciously when damaging the neighbors' house the jury was not limited to the theory of *malice in fact*, and it was thus not required to find that Kurtenbach acted with an intent to do damage to that house. Because of the theory of *malice in law*, the jury could find that Kurtenbach acted maliciously based on his commission of *any wrongful act* that caused damage to the neighbors' house. In this case, Kurtenbach's wrongful act was his participation in the arson of his house. That wrongful act collaterally damaged the neighbors' house, satisfying the definition of vandalism. Because the theory of *malice in law* was applicable to the vandalism count, the trial court was not required, as Kurtenbach claims, to instruct the jury that the wrongful act had to be directed toward causing damage to the neighbors' house. It properly instructed the jury that "[t]he wrongful act need not be 'directed' towards anyone."

E. *Kurtenbach's Constitutional Challenges to His Conviction for Concealing or Knowingly Failing to Disclose an Event Affecting an Insurance Benefit Are Without Merit*

1. *The Application of Section 550, Subdivision (b)(3) in This Case Does Not Infringe Kurtenbach's Fifth Amendment Privilege Against Self-incrimination*

Kurtenbach was charged with concealing or knowingly failing to disclose an event affecting an insurance benefit in violation of section 550, subdivision (b)(3) based on the fact that while his insurance carrier was investigating whether to provide coverage for the damage caused by the fire, Kurtenbach did not inform the carrier that the fire was caused by an arson

that he planned. The prosecutor argued to the jury that Kurtenbach was guilty because "[h]e knew that if he told the insurance company that there was an arson that he planned that he wasn't going to get a payout, so he concealed that and he failed to disclose that."[9]

Kurtenbach contends that a criminal prosecution under section 550, subdivision (b)(3) premised on his failure to disclose that he committed arson violates his privilege against self-incrimination under the Fifth and Fourteenth Amendments to the United States Constitution.[10] He argues, "It seems basic that a defendant who is the primary suspect in a murder/arson case cannot be compelled to confess the arson to his insurance company."

 Section 550, subdivision (b)(3) makes it a crime to "[c]onceal, or knowingly fail to disclose the occurrence of, an event that affects any person's initial or continued right or entitlement to any insurance benefit or payment, or the amount of any benefit or payment to which the person is entitled." "[T]o violate section 550(b)(3) a person, in addition to concealing or knowingly failing to disclose, must intend to obtain benefits to which he or she would not be entitled if they had made the disclosure. In short, the person must intend to commit a fraud." (*People v. Blick* (2007) 153 Cal.App.4th 759, 772 [63 Cal.Rptr.3d 260] (*Blick*).)

 "The Fifth Amendment states that '[n]o person . . . shall be compelled in any criminal case to be a witness against himself.' To qualify for the Fifth Amendment privilege, a communication must be testimonial, incriminating, and compelled." (*Hiibel v. Sixth Judicial Dist. Court of Nev., Humboldt Cty.* (2004) 542 U.S. 177, 189 [159 L.Ed.2d 292, 124 S.Ct. 2451] (*Hiibel*).)[11] The United States Supreme Court has held that, in certain instances, a defendant may invoke the Fifth Amendment privilege against self-incrimination as a defense in a criminal prosecution that is based on the defendant's failure to comply with a statute requiring the disclosure of incriminating information. (*Marchetti v. United States* (1968) 390 U.S. 39 [19 L.Ed.2d 889, 88 S.Ct. 697] (*Marchetti*) [assertion of 5th Amend. was a defense to prosecution for failing to register and pay occupational tax on illegal wagering activities]; *Grosso v. United States* (1968) 390 U.S. 62 [19 L.Ed.2d 906, 88 S.Ct. 709] (*Grosso*) [prosecution for failure to pay excise tax on illegal wagering activity should have been dismissed, on defendant's

[9] According to the testimony of the insurance adjuster, Kurtenbach's policy contained an exclusion for intentional acts and fraud.

[10] In the trial court, Kurtenbach raised a constitutional challenge to the count charging him with concealing an event affecting an insurance benefit as part of his motion to dismiss under section 995.

[11] "[T]he Fifth Amendment's exception from compulsory self-incrimination is also protected by the Fourteenth Amendment against abridgment by the States." (*Malloy v. Hogan* (1964) 378 U.S. 1, 6 [12 L.Ed.2d 653, 84 S.Ct. 1489].)

motion, because compliance with statute would have infringed defendant's 5th. Amend. right against self-incrimination]; *Haynes v. United States* (1968) 390 U.S. 85 [19 L.Ed.2d 923, 88 S.Ct. 722] (*Haynes*) [prosecution for failure to register firearms acquired in a manner out of compliance with other applicable laws should have been dismissed on defendant's motion because the registration requirement violated the defendant's 5th Amend. privilege against self-incrimination]; *Leary v. United States* (1969) 395 U.S. 6 [23 L.Ed.2d 57, 89 S.Ct. 1532] (*Leary*) [invocation of 5th Amend. privilege against self-incrimination should have provided a full defense to a prosecution for failure to pay transfer tax on marijuana].)

However, the United States Supreme Court has set limitations on the circumstances in which a defendant may successfully invoke the Fifth Amendment privilege against self-incrimination as a defense to a prosecution for failing to comply with a statute requiring the disclosure of incriminating information. "Tension between the State's demand for disclosures and the protection of the right against self-incrimination" is "resolved in terms of balancing the public need on the one hand, and the individual claim to constitutional protection on the other." (*California v. Byers* (1971) 402 U.S. 424, 427 [29 L.Ed.2d 9, 91 S.Ct. 1535] (plur. opn. by Burger, J.).) In conducting this balancing, the court has determined that the self-incrimination defense is not available when the incriminating disclosure is required "for compelling reasons unrelated to criminal law enforcement and as a part of a broadly applied regulatory regime." (*Baltimore Dept. of Social Servs. v. Bouknight* (1990) 493 U.S. 549, 561 [107 L.Ed.2d 992, 110 S.Ct. 900] (*Bouknight*); see also *United States v. Hubbell* (2000) 530 U.S. 27, 35, fn. 17 [147 L.Ed.2d 24, 120 S.Ct. 2037] [" 'The Court has on several occasions recognized that the Fifth Amendment privilege may not be invoked to resist compliance with a regulatory regime constructed to effect the State's public purposes unrelated to the enforcement of its criminal laws.' "].) Thus, a defendant may invoke the privilege against self-incrimination as a defense when a statute requiring the disclosure of incriminating information is directed to a " 'highly selective group inherently suspect of criminal activities' " in " 'an area permeated with criminal statutes,' " but the defense is not available when a statute requires disclosure in " 'an essentially noncriminal and regulatory area of inquiry.' " (*Byers*, at p. 430; see also *Bouknight*, at pp. 557–558.) Importantly, the analysis does not focus on whether the disclosures required of the *specific defendant* will require an incriminating statement. Instead, the inquiry is whether, *in general*, the statutory requirements will result in the disclosure of incriminating information. (See *Bouknight*, at p. 561 [observing "production in the vast majority of cases will embody no incriminating testimony, even if in particular cases the act of production may incriminate"]; *U.S. S.E.C. v. Fehn* (9th Cir. 1996) 97 F.3d 1276, 1293 (*Fehn*) ["Although disclosure might have revealed past criminal

violations *in this case*, the disclosure requirement does not, in general, mandate revelation of 'inherently illegal activity.' "].)

The cases most analogous to the situation before us are those discussing a defendant's noncompliance with the disclosure requirements of the federal securities laws. Applying the relevant United States Supreme Court authorities, the federal Ninth Circuit Court of Appeals has concluded that the self-incrimination privilege is not a defense to failure to comply with securities laws requiring certain information to be disclosed in a company's periodic public filings, even when the information withheld is the fact that the company's top executive committed certain securities law violations. (*Fehn, supra*, 97 F.3d at p. 1293.) Relying on controlling United States Supreme Court precedent, *Fehn* explained that a prosecution for failure to disclose the incriminating information was permissible because the relevant disclosure requirements "do not target a 'highly selective group inherently suspect of criminal activities,' [citation], nor do they regulate an activity that is 'permeated with criminal statutes.' " (*Ibid.*; see also *U.S. v. Stirling* (2nd Cir. 1978) 571 F.2d 708, 727–728 [5th Amend. privilege against self-incrimination did not prevent prosecution under federal securities law for failing to disclose information on a registration statement, even when that information could have formed the basis for a prosecution under the Taft-Hartley Act, because the securities laws are essentially noncriminal and regulatory and are not directed at a group inherently suspect of criminal activity].)

As we will explain, when we consider the applicable legal principles, the Fifth Amendment privilege against self-incrimination does not provide a defense to Kurtenbach's conviction under section 550, subdivision (b)(3).

First, as we discussed, one important inquiry is whether the statute "target[s] a 'highly selective group inherently suspect of criminal activities.' " (*Fehn, supra*, 97 F.3d at p. 1293.) Here, the disclosures required by section 550, subdivision (b)(3) will not usually reveal incriminating information, as some of the most common disclosures covered by section 550, subdivision (b)(3) would be, for example, material facts concerning an insured's medical condition as relevant to disability or health insurance, the material facts concerning the operation of an automobile in the case of automobile insurance, the circumstances of an injury or ability to work as relevant to workers' compensation insurance, or the existence of other insurance policies as relevant to the availability of coverage under the policy at issue. It is the rare case when—as here—the required disclosure would be the admission to a crime.

Second, we have noted, we must also consider whether section 550, subdivision (b)(3) "regulate[s] an activity that is 'permeated with criminal

statutes.' " (*Fehn, supra*, 97 F.3d 1276 at p. 1293.) Here, although section 550, subdivision (b)(3) appears in the Penal Code (as it is an antifraud provision with criminal penalties), the activity it regulates is the making of insurance claims. Seeking benefits from an insurance carrier is an essentially legal activity, unlike the area of illegal wagering at issue in *Marchetti, supra*, 390 U.S. 39, and *Grosso, supra*, 390 U.S. 62, the sale and transport of marijuana in *Leary, supra*, 395 U.S. 6, or weapons possession in *Haynes, supra*, 390 U.S. 85.

Finally, we inquire whether section 550, subdivision (b)(3) requires disclosures "for compelling reasons unrelated to criminal law enforcement and as part of a broadly applied regulatory regime." (*Bouknight, supra*, 493 U.S. at p. 561.) As case law explains, "[t]he clear import of section 550 is to criminalize the making of false or fraudulent claims the ultimate objective of which is to obtain benefits to which the offender is not entitled." (*Blick, supra*, 153 Cal.App.4th at pp. 772–773.) Section 550, subdivision (b)(3) functions as an integral part of that antifraud provision by preventing fraud by concealment or a knowing failure to disclose under circumstances constituting fraud. (See *Blick*, at p. 772 [concluding that a violation of § 550, subd. (b)(3) requires a concealment or a knowing failure disclose occur with the fraudulent intent to obtain benefits to which the person is not entitled].) Because it is part of a broader antifraud provision, section 550, subdivision (b)(3) satisfies the requirement that it be enacted for a compelling purpose other than to force a disclosure to be used in criminal law enforcement.

For all of these reasons, we conclude that Kurtenbach may not rely on the Fifth Amendment privilege against self-incrimination as a defense to his conviction under section 550, subdivision (b)(3) for concealing or knowingly failing to disclose that he committed arson.

 An additional and independent consideration supports our conclusion that the self-incrimination privilege does not apply here. The privilege against self-incrimination arises only when testimony is *compelled*. (*Hiibel, supra*, 542 U.S. at p. 189; *Alcaraz v. Block* (9th Cir. 1984) 746 F.2d 593, 603 ["The crucial step in the analysis is whether the testimony, no matter how incriminatory, was ' "compelled" within the meaning of the [Fifth] Amendment.' "].) The United States Supreme Court has held that a person is not *compelled* to make a disclosure when that disclosure is required as part of a *voluntary* application for benefits. Thus, in *Selective Service v. Minn. Public Int. Res. Gp.* (1984) 468 U.S. 841, 856–857 [82 L.Ed.2d 632, 104 S.Ct. 3348], the Fifth Amendment privilege against self-incrimination was not implicated by a statute requiring students who applied for federal financial aid to disclose whether they had complied with military draft registration laws. Even though it was a crime to fail to comply with the draft registration

requirements, a student who did not register was under no compulsion to apply for financial aid and thus was not *compelled* within the meaning of the Fifth Amendment to incriminate himself by disclosing that he had not registered. (*Selective Service*, at pp. 856–857.) Relying on *Selective Service*, other courts have reached a similar conclusion in the context of a person who is forced to incriminate himself as part of a voluntary process to obtain benefits. (*Alcaraz*, at p. 604 [privilege against self-incrimination did not apply to persons required to divulge Social Security numbers of household members when applying for subsidized school meals]; *Ciccone v. Secretary of DHHS of U.S.* (2d Cir. 1988) 861 F.2d 14, 17–18 [5th Amend. privilege against self-incrimination did not permit applicant for Social Security benefits to refuse to provide information about his former occupation on the ground that it might incriminate him, as he was under no compulsion to apply for the benefits].)

 Section 550, subdivision (b)(3) applies only when a person is attempting to obtain insurance benefits. Indeed, case law establishes that "to violate section 550(b)(3) a person . . . *must intend to obtain benefits* to which he or she would not be entitled if they had made the disclosure." (*Blick, supra*, 153 Cal.App.4th at p. 772, italics added.) As in the cases described above, there was no requirement that Kurtenbach pursue a claim for insurance benefits. Although the evidence at trial was that Kurtenbach's insurance agent initially filed the claim upon learning of the fire, the evidence supported a finding that Kurtenbach had an opportunity to withdraw that claim, but did not do so. The jury made an implied finding—as required by the applicable jury instruction—that Kurtenbach failed to disclose the arson *"in order that he could obtain benefits* to which he would not be entitled if he had disclosed that fact." (Italics added.) Under those circumstances, Kurtenbach was not *compelled* by section 550, subdivision (b)(3) to disclose the arson. Instead, he voluntarily put himself within the reach of the statutory disclosure requirements by attempting to obtain insurance benefits. In the absence of legal *compulsion* to make an incriminating disclosure, the Fifth Amendment privilege against self-incrimination does not apply.

2. *An Application of Section 550, Subdivision (b)(3) in This Case Did Not Violate Kurtenbach's Right to Due Process*

Kurtenbach also challenges his conviction under section 550, subdivision (b)(3) on due process grounds, contending that it was "fundamentally unfair" under the circumstances to charge him with concealing or knowingly failing to disclose an event affecting an insurance claim. Kurtenbach's argument is not well developed, but we understand him to be arguing that the constitutional principles of due process are offended because the People charged him with a violation of section 550, subdivision (b)(3) while the

insurance adjuster's investigation was still ongoing. Apparently, Kurtenbach contends that it was unfair to charge him with failing to make the disclosures required by section 550, subdivision (b)(3) because he did not have a meaningful opportunity to comply.

Without even considering whether any legal authority supports Kurtenbach's cursory argument, we reject it on a factual basis. Kurtenbach was first charged in this case in June 2009, which was more than seven months after the fire. He had ample opportunity during that period either to attempt to avoid a charge under section 550, subdivision (b)(3) by withdrawing the claim for insurance benefits or to make the required disclosure.

F. *Kurtenbach's Contention That the Execution of Certain Portions of His Sentence Must Be Stayed Pursuant to Section 654*

We next consider Kurtenbach's contention that execution of the eight-month sentence imposed on the vandalism conviction and the one-year sentence imposed on the conviction for concealing an event affecting an insurance benefit should have been stayed under section 654 because those convictions arose from the same course of conduct as the conviction for arson causing great bodily injury.

 Under section 654, subdivision (a), "[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." (*Ibid.*) "[S]ection 654 applies not only where there was but one act in the ordinary sense, but also where there was a course of conduct which violated more than one statute but nevertheless constituted an indivisible transaction. [Citation.] . . . [Citation.] If all the offenses were *incident to one objective*, the defendant may be punished for any *one* of such offenses but not for more than one." (*People v. Perez* (1979) 23 Cal.3d 545, 551 [153 Cal.Rptr. 40, 591 P.2d 63] (*Perez*), italics added.) "If [a] defendant harbored 'multiple criminal objectives,' which were independent of and not merely incidental to each other, he may be punished for each statutory violation committed in pursuit of each objective, 'even though the violations shared common acts or were parts of an otherwise indivisible course of conduct.' " (*People v. Harrison* (1989) 48 Cal.3d 321, 335 [256 Cal.Rptr. 401, 768 P.2d 1078].) The application of section 654, thus, "turns on the *defendant's* objective in violating" multiple statutory provisions. (*People v. Britt* (2004) 32 Cal.4th 944, 952 [12 Cal.Rptr.3d 66, 87 P.3d 812] (*Britt*).) Where the commission of one offense is merely " 'a means toward the objective of the commission of the other,' " section 654 prohibits separate punishments for the two offenses. (*Britt*, at p. 953.)

Where "section 654 prohibits multiple punishment, the trial court must stay execution of sentence on the convictions for which multiple punishment is prohibited." (*People v. Reed* (2006) 38 Cal.4th 1224, 1227 [45 Cal.Rptr.3d 353, 137 P.3d 184].) We apply a substantial evidence standard of review when determining whether section 654 applies. "The determination of whether there was more than one objective is a factual determination, which will not be reversed on appeal unless unsupported by the evidence presented at trial." (*People v. Saffle* (1992) 4 Cal.App.4th 434, 438 [5 Cal.Rptr.2d 648]; see also *People v. Osband* (1996) 13 Cal.4th 622, 730 [55 Cal.Rptr.2d 26, 919 P.2d 640] [approving substantial evidence standard of review as stated in *Saffle*].)

1. *The Sentence for Concealing an Event Affecting an Insurance Benefit*

We first examine whether section 654 precludes the imposition of a sentence for arson causing great bodily injury (§ 451.1, subd. (a)) and concealing an event affecting an insurance benefit (§ 550, subd. (b)(3)). Kurtenbach contends that section 654 applies because both counts were part of a single course of conduct aimed at fraudulently obtaining an insurance payment. As we will explain, we disagree.

As our Supreme Court has explained in referring to section 654, "a course of conduct divisible in time, although directed to one objective, may give rise to multiple violations and punishment." (*People v. Beamon* (1973) 8 Cal.3d 625, 639, fn. 11 [105 Cal.Rptr. 681, 504 P.2d 905] (*Beamon*).) "This is particularly so where the offenses are temporally separated in such a way as to afford the defendant opportunity to reflect and to renew his or her intent before committing the next one, thereby aggravating the violation of public security or policy already undertaken." (*People v. Gaio* (2000) 81 Cal.App.4th 919, 935 [97 Cal.Rptr.2d 392].) This rule has been applied in numerous instances when several crimes could broadly be described as part of an overarching criminal plan, but were committed on different days. (See, e.g., *People v. Andra* (2007) 156 Cal.App.4th 638, 640–642 [67 Cal.Rptr.3d 439] [defendant's commission of identity theft to facilitate a vehicle theft and to obtain money by false pretenses did not implicate § 654, because the identity theft occurred prior to the other crimes]; *People v. Kwok* (1998) 63 Cal.App.4th 1236, 1256 [75 Cal.Rptr.2d 40] [burglary to facilitate commission of crimes nine days later not subject to § 654]; *People v. Williams* (1988) 201 Cal.App.3d 439, 442 [247 Cal.Rptr. 200] [burglary to obtain jewels to facilitate solicitation of murder months later was part of the same scheme but not subject to § 654].)

The arson and Kurtenbach's failure to disclose the arson to his insurance carrier occurred at different times. The arson occurred at the time of the fire.

The failure to disclose the arson to the insurance carrier occurred in the following days and months as the insurance adjuster investigated the insurance claim. Therefore, because the two crimes constituted a "course of conduct divisible in time" (*Beamon, supra*, 8 Cal.3d at p. 639, fn. 11), section 654 does not preclude punishment for both crimes.

### 2. *The Sentence for Vandalism*

We now examine whether section 654 precludes punishment for both the arson and the vandalism conviction.

As we have explained, the fundamental inquiry is whether the two crimes constituted "an indivisible transaction" and were "incident to one objective." (*Perez, supra*, 23 Cal.3d at p. 551.) Kurtenbach's single objective was to burn down his house, and in the process collateral damage occurred to the neighbors' house. Thus, both crimes were "incident to one objective." (*Ibid.*) Further, because the arson and the vandalism were committed by the single act of setting Kurtenbach's house on fire, they constitute "but one act in the ordinary sense," as well as being two parts of "an indivisible transaction" within the meaning of the case law applying section 654. (*Perez*, at p. 551.) Therefore, unless an exception applies, section 654 prevents multiple punishment.

According to the People, the trial court properly imposed punishment for both the arson and the vandalism because the crimes had different victims.[12] We understand the People to be referring to the long-standing rule that " 'the limitations of section 654 do not apply to crimes of violence against multiple victims.' " (*People v. Oates* (2004) 32 Cal.4th 1048, 1063 [12 Cal.Rptr.3d 325, 88 P.3d 56].) Importantly, however, the multiple-victim exception to section 654 only applies to crimes of violence against persons, not crimes against property. (*People v. Bauer* (1969) 1 Cal.3d 368, 377 [82 Cal.Rptr. 357, 461 P.2d 637].) "Section 654 is not '. . . applicable where . . . one act has two results each of which is an act of violence *against the person* of a separate individual.' " (*Neal v. State of California* (1960) 55 Cal.2d 11, 20–21 [9 Cal.Rptr. 607, 357 P.2d 839], italics added; see also *People v. Hall* (2000) 83 Cal.App.4th 1084, 1089 [100 Cal.Rptr.2d 279] (*Hall*).) As our Supreme Court has explained, "[a] defendant who commits an act of violence with the intent to harm more than one person or by a means likely to cause harm to several persons is more culpable than a defendant who harms only

---

[12] The People also argue that multiple punishment was appropriate under section 654 for the vandalism and arson counts because the underlying statutes "are aimed at different evils" with different "statutory objectives." That approach finds no support in the case law applying section 654, where the focus is on the defendant's objective (*Britt, supra*, 32 Cal.4th at p. 952), rather than on the reasons why the Legislature enacted the criminal law statutes that the defendant violated.

one person." (*Neal*, at p. 20.) Further, the multiple-victim exception to section 654 only applies when *both* of the crimes at issue are crimes of violence against a person. (*People v. Miller* (1977) 18 Cal.3d 873, 886 [135 Cal.Rptr. 654, 558 P.2d 552] [§ 654 did not preclude multiple punishment when the defendant was "convicted of a second crime of violence against a second victim"].)

 We must look to the statutory definition of the crimes at issue, including any allegations in enhancement, to determine whether those crimes were crimes of violence against a person within the meaning of the multiple-victim exception to section 654. (*Hall, supra*, 83 Cal.App.4th at p. 1089.) The crime of arson causing great bodily injury is indisputably a crime of violence against a person, as it includes the element of great bodily injury. (See *People v. Clark* (1990) 50 Cal.3d 583, 637 [268 Cal.Rptr. 399, 789 P.2d 127] [stating that "arson is an act of violence . . ."].) However, vandalism is *not* a crime of violence against a person. The vandalism statute under which Kurtenbach was convicted criminalizes the act of causing damage or destruction "with respect to any real or personal property not his or her own." (§ 594, subd. (a).) It does not require injury to a person, and instead describes a crime against property. Accordingly, the multiple-victim exception to section 654 does not apply because vandalism is not a crime of violence against a person.

In the absence of any applicable exception, section 654 bars multiple punishment for the vandalism and the arson convictions. Execution of the eight-month sentence on Kurtenbach's vandalism conviction must be stayed pursuant to section 654, and we direct the trial court to modify the judgment accordingly.

G. *The Trial Court Did Not Rely on an Element of the Crime to Impose an Upper Term Sentence*

The trial court selected the upper term for Kurtenbach's conviction for arson causing great bodily injury. The trial court explained its reasons for selecting the upper term: "[T]here are significant aggravants, most importantly of which are the indifference and callousness demonstrated by the defendant. He had somebody do his bidding. He had somebody do his dirty work. I'm absolutely convinced that he was the brains of the operation. He induced the decedent to do his work for him and, in essence, he created a bomb. . . . [T]he fact that he orchestrated this and induced others to act and the planning and sophistication that he demonstrated in the commission of these offenses warrants the imposition of the upper term."

 As Kurtenbach points out, California Rules of Court, rule 4.420(d) states that "[a] fact that is an element of the crime upon which punishment is

being imposed may not be used to impose a greater term." Under this rule, a court may not "use a fact constituting an element of the offense either to aggravate or to enhance a sentence." (*People v. Scott* (1994) 9 Cal.4th 331, 350 [36 Cal.Rptr.2d 627, 885 P.2d 1040] (*Scott*).) According to Kurtenbach, the trial court violated this rule by relying on aggravating factors that constituted an element of the crime of arson causing great bodily injury. Specifically, he claims that the trial court improperly considered (1) that Kurtenbach induced someone else to set the fire and (2) the planning and sophistication involved in the arson. As we will explain, neither of those facts is an element of the crime of arson causing great bodily injury.

■ As we have discussed, the crime of arson is committed when someone "willfully and maliciously sets fire to or burns or causes to be burned or . . . aids, counsels, or procures the burning of, any structure." (§ 451.) It is not a necessary element of arson that the defendant *induced someone else* to set the fire. As the statutory language emphasizes, there are many types of participation in the burning of a structure that will constitute arson. The trial court was entitled to distinguish between those types of participation in determining that because Kurtenbach acted as "the brains of the operation" and chose someone else to be physically present during the fire, he acted with callousness and indifference.

As for Kurtenbach's claim that the trial court relied on an element of the crime by noting that planning and sophistication were involved, that claim fails because the crime of arson plainly contains no requirement that the arson be planned in advance or involve sophistication, and Kurtenbach cites no authority suggesting such a requirement.

In addition, as the People correctly point out, Kurtenbach did not object to the trial court's use of the aggravating factors that he identifies in his appellate argument. Accordingly, Kurtenbach may not raise the issue on appeal. (*Scott, supra,* 9 Cal.4th at p. 353 [unless raised at trial, defendant waives appellate argument concerning "the trial court's failure to properly make or articulate its discretionary sentencing choices"].)

For both of these reasons, we reject Kurtenbach's contention that the trial court improperly imposed an upper term based on aggravating factors that were facts constituting an element of the offense.

## DISPOSITION

The trial court is directed to modify the abstract of judgment to state that execution of the eight-month sentence imposed for the conviction of vandalism (§ 594, subds. (a), (b)(1)) is stayed pursuant to section 654. The trial

court shall forward a certified copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

Haller, Acting P. J., and McDonald, J., concurred.

A petition for a rehearing was denied May 2, 2012, and appellant's petition for review by the Supreme Court was denied July 18, 2012, S202554. Kennard, J., was of the opinion that the petition should be granted.